# EXHIBIT 4

1      IN THE UNITED STATES DISTRICT COURT

2        NORTHERN DISTRICT OF ILLINOIS

3          EASTERN DIVISION

4 THIRTEEN INVESTMENT      )

5 COMPANY, INC.,          )

6          Plaintiff,    )

7   vs.            ) No. 19-cv-04630

8 FOREMOST INSURANCE COMPANY )

9 GRAND RAPIDS, MICHIGAN,    )

10         Defendant.     )

11      The deposition of VINCENT BERTUCA, called

12 for examination pursuant to the Rules of Civil

13 Procedure for the United States District Courts

14 pertaining to the taking of depositions, taken

15 before Johnetta Stafford Taylor, a Registered

16 Professional Reporter within and for the State

17 of Illinois, at 222 North LaSalle Street, Suite

18 1400, Chicago, Illinois, on January 3, 2020, at

19 the hour of 11:00 a.m.

20

21

22

23 Johnetta Stafford Taylor

24 License No: 084-001583

                1

---

1 APPEARANCES:

2

3     SCHUYLER ROCHE & CRISHAM, P.C.

4     BY: MR. JOHN P. O'MALLEY,

5     180 North Stetson Avenue

6     Suite 3000

7     Chicago, Illinois 60601

8     (312) 565-8487

9     jomalley@srcattorneys.com

10      Representing the Plaintiff;

11

12     FORAN GLENNON PALANDECH

13     PONZI & RUDLOFF PC

14     BY: MR. MATTHEW P. FORTIN and

15     MS. SARAH JOHNSON,

16     222 North LaSalle Street

17     Suite 1400

18     Chicago, Illinois 60601

19     (312) 863-5000

20     mfortin@fgppr.com

21     sjohnson@fgppr.com

22      Representing the Defendant;

23

24

                2

---

1 APPEARANCES: (Continued)

2

3     ANTHONY T. BERTUCA,

4     Attorney and Counselor at Law,

5     6446 West Cermak Road

6     Berwyn, Illinois 60402

7     (708) 795-5150

8     (email address unavailable)

9      Representing the Deponent.

10

11        *******

12

13

14

15

16

17

18

19

20

21

22

23

24

                3

---

1         I N D E X

2 WITNESS             EXAMINATION

3 VINCENT BERTUCA

4   By Mr. Fortin          5

5   By Mr. O'Malley        87

6   By Mr. Bertuca        107

7   By Mr. Fortin (Further)    111

8   By Mr. O'Malley (Further)   112

9   By Mr. Bertuca (Further)    117

10

11

12

13         E X H I B I T S

14 NUMBER             MARKED FOR ID

15

16

17   (All exhibits previously marked by Mr. Fortin.)

18

19

20

21

22

23

24

                4

1          (whereupon, the witness
2          was duly sworn.)
3      MR. FORTIN:  Good morning, Mr. Bertuca.
4      THE WITNESS:  Good morning.
5      MR. FORTIN:  My name is Matthew Fortin.  I
6  represent the Defendant in this lawsuit.
7  Sitting next to me is Sarah Johnson, who also
8  represents the Defendant.  We also have Mr. John
9  O'Malley here who represents the Plaintiff,
10 Thirteen Investment.
11          VINCENT BERTUCA,
12 called as a witness herein, was examined and
13 testified as follows:
14          EXAMINATION
15 BY MR. FORTIN:
16     Q.  Can you say and spell your full name
17 for us, please.
18     A.  First name is Vincent.  V-I-N-C-E-N-T.
19 Last name is Bertuca.  B, as in boy, E-R-T-U-C-A.
20     Q.  And do you have a middle name?
21     A.  Yes.  Anthony.
22     Q.  Okay.  And what's your date of birth,
23 Anthony -- or Mr. Bertuca.  I'm sorry.
24     A.  You can call me Vince, please.

                                               5

1      5/18/1977.
2      Q.  And what are the last four of your
3  Social?
4      A.  3830.
5      Q.  And do you have a residential address?
6      A.  Where I live?
7      Q.  Yes.
8      A.  Yes.  3864 Wherman Avenue in Schiller
9  Park.
10     Q.  How do you spell that?
11     A.  W-H-E-R-M-A-N.
12     Q.  Thank you.
13         And do you also have a business
14 address?
15     A.  Yes.
16     Q.  And what is that?
17     A.  7301 West 25th Street, No. 111 in North
18 Riverside, Illinois.
19     Q.  All right.  Ever been convicted of a
20 felony or any other crime involving dishonesty?
21     A.  No.
22     Q.  And are you affiliated with a business
23 entity called Paramount Restoration Group?
24     A.  Yes, I am.

                                               6

1      Q.  And what's your position with respect
2  to that business?
3      A.  President/owner.
4      Q.  Okay.  Is that a corporation or an LLC?
5      A.  A corporation.
6      Q.  Are you the sole shareholder?
7      A.  I believe so.  Yes.
8      Q.  Is Paramount located at -- or just tell
9  me what address Paramount's at if you don't
10 mind.
11     A.  The 7301 is our mailing address.  It's
12 a P.O. box.  It's a UPS Store.
13     Q.  Okay.  Does Paramount have any other
14 addresses that it uses?
15     A.  On some letterhead there is an address
16 in Hillside and that was just a storage facility
17 that I was using.  Not an actual storage
18 facility.  It was an office of a friend of
19 mine's company.  I can't think of the address
20 off the top of my head.  But it was just in my
21 early stages of when I opened it was just...
22     Q.  Is it 4302 Warren Avenue?
23     A.  Yes.  Yes.
24     Q.  So you no longer use that address?

                                               7

1      A.  No, no, no.
2      Q.  Does Paramount have a physical office
3  anywhere?
4      A.  My car.
5      Q.  What kind of car do you have?
6      A.  A Tahoe.
7      Q.  Okay.  What color?
8      A.  Silver.
9      Q.  But the mailing address for Paramount
10 is still 7301 --
11     A.  Yes.  Yes.
12     Q.  But that's a P.O. box you said?
13     A.  It's not technically a P.O. box because
14 it's at a UPS facility.
15     Q.  Okay.
16     A.  So it's a box that I pay for so I have
17 a mailing address where people will always be.
18     Q.  Got it.
19         Does Paramount Restoration Group have
20 any employees?
21     A.  It's more of a per job employee, how I
22 handle it.
23     Q.  So you have independent contractors?
24     A.  On a lot of stuff, yes.

                                               8

1    Q.   Does Paramount have any employees?
2    A.   Full-time?  No.
3    Q.   Any part-time employees?
4    A.   It would be based per job.
5    Q.   Okay.
6    A.   I'm sorry.  I --
7    Q.   No.  That's fine.
8         Are there any individuals to whom
9    Paramount issues a W-2 tax form?
10   A.   No.  If I gave it to someone, it would
11   be a W-9.
12   Q.   Okay.  And would that also be true as
13   of 2017?
14   A.   I'd have to check.  I don't know off
15   the top of my head.  I would think so.  Yes.
16   Q.   Do you have a common group of people
17   who you normally use for W-9 work?
18   A.   A very similar group of -- yes.  A very
19   similar group of guys.  Yes.
20   Q.   You're aware that we're here today to
21   talk about an insurance claim that involved a
22   property at 3634 Euclid?
23   A.   Uh-huh.
24   Q.   A fire that occurred in May of 2018,

9

1    right?
2    A.   Yes.
3    Q.   Were any of your W-9s involved in that
4    claim at all other than yourself?
5    A.   I honestly don't know.  I'd have to
6    check.  I don't want to give you the wrong
7    answer.
8    Q.   That's fine.  I appreciate that.
9         So as we go through your deposition
10   today, if at any point you remember the answer
11   to something that you didn't recall earlier or
12   if you need to correct or clarify a previous
13   answer, please speak up and let me know.  Okay?
14   A.   Okay.  Thank you.
15   Q.   And actually, I forgot to do this at
16   the beginning which I normally do.
17        Have you ever been deposed before?
18   A.   Yes, I have.  Not me personally.  I had
19   to do it for a company I worked for before I
20   opened.
21   Q.   Okay.  And what was the nature of the
22   dispute in which you gave that deposition?
23   A.   Do you know what?  I think it was
24   between -- it was after I had left the

10

1    company -- I had a company similar, in the same
2    industry.  I was already opened.  And I don't
3    know the exact details.  It was more of a
4    material thing I believe or time of the job
5    getting done.
6    Q.   What kind of loss was it?
7    A.   A fire.
8    Q.   And what was that company that you
9    worked for at the time?
10   A.   Restore Construction Company.
11   Q.   How long were you with Restore?
12   A.   Over 13 years.
13   Q.   Are you familiar with the fire that
14   occurred at the Proviso Township High School?
15   A.   I knew about it, but I had nothing to
16   do with the company at that time.  I was no
17   longer an employee.  I knew about the fire.
18   Q.   Okay.  But was your -- the deposition
19   that you gave, did it have anything to do with
20   that?
21   A.   No.  No.  Nothing to do with that.  I
22   was no longer an employee when Proviso had that
23   fire.
24   Q.   Okay.  Do you recall who the insurance

11

1    carrier was in the matter in which you were
2    deposed?
3    A.   Oh, gosh.  No.
4    Q.   Were you represented by an attorney at
5    that deposition?
6    MR. BERTUCA:  I was the attorney.
7    MR. FORTIN:  Okay.  And, Mr. Bertuca, I
8    understand -- are you Vincent's father?
9    MR. BERTUCA:  Yes.
10   MR. FORTIN:  Okay.  Thank you.
11   BY MR. FORTIN:
12   Q.   Do you recall if that deposition was
13   given in a matter that was pending in state
14   court as opposed to federal court?
15   MR. BERTUCA:  I have no idea.  I can't
16   remember.
17   THE WITNESS:  I can't remember.
18   BY MR. FORTIN:
19   Q.   Did the deposition take place in
20   Illinois?
21   A.   Yes.
22   Q.   Was it in the Chicago area?
23   A.   Yes.
24   Q.   Okay.  Do you happen to have a copy of

12

1    your transcript of that deposition?
2        A.   No, I don't.
3        Q.   Okay.  Prior to starting business as
4    Paramount Restoration Group, you were employed
5    with Restore for about 13 years?
6        A.   Yes.
7        Q.   Okay.  And what was your position at
8    Restore?
9        A.   Sales, public adjuster, field services.
10       Q.   What's your highest level of education?
11       A.   I graduated from college.
12       Q.   With a degree in what?
13       A.   Political science and business
14   administration.
15       Q.   Where did you graduate from?
16       A.   St. Ambrose University in Davenport,
17   Iowa.
18       Q.   And when was that?
19       A.   1999.
20       Q.   Okay.  Was Paramount your first job out
21   of school.
22       A.   No.
23       Q.   I mean Restore.
24       A.   Pretty close.  Probably, you know,

13

1    bartending or something of that nature in
2    between.
3        Q.   But your Restore job was your first job
4    in the construction or insurance industry?
5        A.   Yes.
6        Q.   Do you currently have your adjuster's
7    license?
8        A.   My public adjuster's license?
9        Q.   Yes.
10       A.   Yes.
11       Q.   Is that in the state of Illinois?
12       A.   Yes.
13       Q.   Are you licensed in any other states?
14       A.   I've done claims in Iowa.  And there's
15   a -- you don't have to be -- you can just use
16   your Illinois license.
17       Q.   Okay.
18       A.   And I did one in Wisconsin before.
19       Q.   Have you ever been licensed as a public
20   adjuster in any state other than Illinois?
21       A.   No, I have not.
22       Q.   Has your Illinois public adjuster's
23   license ever been suspended, revoked or subject
24   to discipline for any reason?

14

1        A.   No, it has not.
2        Q.   Do you have a contractor's license of
3    any kind?
4        A.   A general contractor's license?  Yes.
5        Q.   In what state?
6        A.   Well, it would be -- you can only get
7    licensed in towns.
8        Q.   Okay.  That's what I was going to --
9    yes.
10            In what town do you have a general
11   contractor's license?
12       A.   I don't always renew them.  I kind of
13   base that if I'm going to do work in the town,
14   then I'll, you know, get my insurance and bond.
15       Q.   Have you ever been a licensed
16   contractor in Berwyn, Illinois?
17       A.   Yes.
18       Q.   Okay.  Are you currently a licensed
19   contractor in Berwyn?
20       A.   Yes, I am.
21       Q.   How long have you been continuously
22   licensed in Berwyn?
23       A.   Since I opened Paramount.
24       Q.   Okay.  And when did you open Paramount?

15

1        A.   Approximately 2013.
2        Q.   Okay.  And have any of your
3    contractor's licenses in whatever town or county
4    ever been suspended, revoked or otherwise
5    subject to discipline?
6        A.   No, they have not.
7        Q.   Do you own or have an ownership
8    interest in any entities other than Paramount
9    Restoration Group?  And I'm not talking about do
10   you own stock in Pepsi or something like that.
11   I just mean do you have any ownership in any
12   other closely-held businesses?
13       A.   Any other businesses?
14       Q.   Yes.
15       A.   No.
16       Q.   Okay.  Are you the only adjuster --
17   strike that.  That was going to be a bad
18   question.
19            All right.  I'm going to hand you some
20   documents as we go through today.
21       A.   Okay.
22       Q.   Some of them are documents that you
23   brought with you to today's deposition.
24       A.   Okay.

16

1    Q.   Some of them are things that I already
2  have.
3    A.   Okay.
4    Q.   And when I hand you an exhibit, I'll
5  hand it to your attorney first.
6    A.   Uh-huh.
7    Q.   And then once he's had a chance to
8  familiarize himself with it, I'll hand it to you
9  and we'll get going.
10   A.   Okay.
11   MR. FORTIN:  And as I do that I'll hold up
12 the document so that Mr. O'Malley down at the
13 other side of the table will see what I'm
14 talking about.
15       Okay.  I'm going to hand you what I've
16 marked as Exhibit No. 14, Mr. Bertuca.
17   MR. BERTUCA:  This is yours, right?
18   THE WITNESS:  Uh-huh.
19   MR. BERTUCA:  Okay.
20            (Exhibit 14 was previously
21              marked.)
22 BY MR. FORTIN:
23   Q.   And this is a document that you brought
24 with you today?

17

1    A.   Yes.  It was just some claim
2  information that I had.
3    Q.   Okay.  Is all the handwriting on
4  Exhibit 14 yours?
5    A.   Yes.
6    Q.   Okay.  It says Scott Woods and then it
7  has a phone number?
8    A.   Uh-huh.
9    MR. BERTUCA:  You have to answer.
10   THE WITNESS:  I'm sorry.  Yes.  Yes.  I'm
11 sorry.
12   MR. FORTIN:  Your attorney may have told you
13 this before you came in, but a few things that I
14 also should have gone over to make this go as
15 smoothly as possible.  You and I need to do our
16 best not to talk over each other.  And you need
17 to do your best to give verbal responses.  Okay?
18   THE WITNESS:  Yes.
19   MR. FORTIN:  So you can nod, you can shake
20 your head, you can roll your eyes at me.  That's
21 perfectly fine.  But you need to accompany that
22 with a verbal response.
23   THE WITNESS:  Okay.  I understand.
24   MR. FORTIN:  Thank you.

18

1  BY MR. FORTIN:
2    Q.   Who do you understand Scott Woods to
3  be?
4    A.   He was the claim adjuster for this
5  claim.
6    Q.   All right.  And your note also says ACV
7  only?
8    A.   Correct.
9    Q.   Does that reflect your understanding
10 that the insurance policy that covered Thirteen
11 Investment Co. at 3634 South Euclid only allowed
12 recovery on an actual cash value basis?
13   A.   That is correct.
14   MR. FORTIN:  Okay.  And just to limit the
15 number of tongue twisters and times I trip over
16 my own words, rather than say 3634 South Euclid
17 all day, I'm just going to refer to the
18 property.
19   THE WITNESS:  Okay.
20   MR. FORTIN:  Is that fair?
21   THE WITNESS:  That's fair.
22   MR. FORTIN:  All right.  Thank you.
23 BY MR. FORTIN:
24   Q.   Your note also says Mike Stanzec [sic],

19

1  S-T-A-N-Z-E-C [sic], I believe.
2        Am I reading that correctly?
3    A.   Yes.  I think it's S-T -- I'm sorry
4  about my handwriting -- A-R-Z-A-C [sic] I
5  believe is the correct spelling.
6    Q.   A-R-Z-A-C [sic]?
7    A.   I believe.
8    Q.   Okay.  In any event, is that -- who is
9  that?
10   A.   One of the owners of the property.
11   Q.   So he would be -- or it was your
12 understanding that he was one of the principals
13 of Thirteen Investment?
14   A.   Yes.
15   Q.   Did you deal with anyone other than
16 Mr. Starzec?
17   A.   Yes.  Gary Hanley.
18   Q.   Okay.  That's the other individual
19 whose name is listed here.
20       So did you understand Mr. Hanley to
21 also be an owner or representative of --
22   A.   That was my understanding.
23   Q.   You have to let me finish the question.
24   A.   I'm sorry.

20

Q. That's all right.

It means you're trying to be helpful. So I appreciate the sentiment.

Other than Mr. Starzec and Mr. Hanley, is there any other representative of Thirteen Investment that you've dealt with in the course of this claim?

A. No.

Q. At the bottom of Exhibit 14, it also says tenants and then I confess I can't read what's below that. Can you help me out?

A. It's a note for myself about the mechanicals.

Q. Okay. So that says all mechanicals?

A. Electric, plumbing. It's just a note I had down there that I did for my own mind when looking at this.

Q. Okay. And what did you intend to capture by this note? What does it mean?

A. It was to -- because there was no municipal code coverage on this policy and I was making a point to make sure I identify all mechanical issues because a lot of the repair of that if there was requirement changes that

21

needed to be done, it wouldn't be covered.

Q. Okay. And you're referring to an increased cost of repair construction that would be due to the enforcement of an ordinance or law?

A. Correct.

Q. So it's your understanding that that coverage was not part of this policy?

A. Correct.

Q. Okay. Now, I'll hand you Exhibit 15.

A. Uh-huh.

(Exhibit 15 was previously marked.)

MR. FORTIN: It's the other handwritten note, John.

MR. O'MALLEY: Okay.

BY MR. FORTIN:

Q. And this is another one of the documents that you brought with you today. Are these all your handwritten notes?

A. Yes, they are.

Q. Okay. On the top left, it looks like it says March 1. Am I right?

A. Yes. It appears that way. Yes.

22

Q. Would that be the date that you made these notes?

A. I would assume so. Yes. That's why I have the date there.

Q. Okay. And can you just describe for me what do these notes represent?

A. The insureds wanted kind of -- demand -- not demand -- demanded central air and central heat to be installed. The building only had boiler radiant heat. And the boiler was getting fully replaced by the insurance. And I was -- these were notes I did for myself trying to make the numbers work. Figuring out exactly what was paid for for the boiler replacement. Because there was so much more that went into installing central air, central heat when there's only a boiler system in a house.

Q. So the property did not have central air or central heat as of the time of the fire?

A. That is correct.

Q. Okay.

MR. FORTIN: I'll hand you Exhibit 16, John.

(Exhibit 16 was previously marked.)

23

MR. FORTIN: John, 16.

MR. O'MALLEY: Okay.

BY MR. FORTIN:

Q. Is that a copy of the contract between Paramount and Thirteen Investment to represent it in connection with this insurance claim?

A. Yes, it is.

Q. All right. We'll come back to that one, but you can put that to the side.

MR. FORTIN: I'll hand you Exhibit 17.

(Exhibit 17 was previously marked.)

MR. O'MALLEY: Okay.

BY MR. FORTIN:

Q. And this is another document you brought with you today, correct?

A. Correct.

Q. Okay. And can you tell me what this is?

A. A bill for boarding up and securing the property after the fire.

Q. Okay. Is this a description of work that had been performed or which was to be performed?

24

1    A.   This is a description of work that was
2  performed.  The work is performed immediately
3  after the fire department is complete with
4  putting out the fire and then we're instructed
5  to secure the property.
6    Q.   Okay.  Who did the board-up?
7    A.   I did.  We did.
8    Q.   Okay.  Did you personally do it or did
9  you --
10   A.   No.  I had -- I don't remember who I --
11  exactly who I had do that.
12   Q.   And was this document ever actually
13  submitted to Farmers?
14   A.   Yes, it was.
15   Q.   And was the $825 total of this invoice,
16  was that paid?
17   A.   The invoice was paid.  I don't remember
18  if maybe a little was knocked off.  Sometimes
19  adjusters do that.  So...
20   Q.   Okay.
21       MR. FORTIN:  I'm going to hand you
22  Exhibit 18.
23              (Exhibit 18 was previously
24              marked.)

25

1  BY MR. FORTIN:
2    Q.   Which is a collection of it looks like
3  ComEd bills?
4    A.   Correct.
5    Q.   And you brought these with you today,
6  right?
7    A.   Yes, I did.
8    Q.   What relevance do these have to this
9  particular matter?
10   A.   I had the power -- after I had asked
11  the insureds on multiple occasions that we
12  needed power turned on.  I can't do that because
13  I'm not the building owner.  So I went -- it
14  needed to get done.  I was getting negative
15  feedback from the insureds in regards to the
16  time that the job was taking, and I simply took
17  it upon myself after I'd asked numerous times to
18  please get the power on, that we did it
19  ourselves because we were at a point with the
20  job that we had to get power in the building.
21   Q.   So to do that did you have to get the
22  account at the property put in your name?
23   A.   That's the only way you could do it.
24   Q.   So at some point you called up ComEd

26

1  and --
2    A.   I called up ComEd.  Correct.
3        Sorry.
4    Q.   And it looks like these bills here that
5  we've marked as Exhibit 18, they span roughly
6  June 2000 -- later than that.  They span roughly
7  April 2019 through November 2019; is that
8  accurate?
9    A.   Yes.  From what I'm seeing, yes.
10   Q.   And that would reflect the -- or I
11  guess April 2019 or thereabouts would have been
12  when you took it upon yourself to have the power
13  turned back on?
14   A.   Correct.
15   Q.   Okay.  Why were you having the property
16  turned onto the property?  Were you doing
17  repairs there?
18   A.   Yes, we were.
19   Q.   When did those repairs start?
20   A.   I can't think of the exact day we
21  started work.
22   Q.   For purposes of today's deposition,
23  when I ask you when something occurred, I never
24  expect your first answer to be the exact day on

27

1  which it occurred.
2    A.   Okay.
3    Q.   That would be amazing, but I don't
4  expect it.  So the closest approximation you can
5  give me as far as the month/season, we can start
6  from there.
7    A.   I would guess August/September.  Into
8  August or September.
9    Q.   Of 2019?
10   A.   Of 2018.
11   Q.   2018?
12   A.   Correct.
13   Q.   Okay.  And so when you started repairs,
14  was the power still on?
15   A.   No.
16   Q.   So did you do repairs from August 2018
17  to April 2019 with no power?
18   A.   Correct.
19   Q.   How does that work?
20   A.   I bring generators.
21   Q.   And then eventually you got fed up with
22  bringing generators and got the power turned on?
23   A.   It wasn't necessarily being fed up.  It
24  was also we needed to make sure electric was

28

1  working properly based on the new electric that
2  we had done. And also, the additional HVAC work
3  that was performed.
4       MR. FORTIN: I'm going to hand you
5  Exhibit 19, which is a July 18, 2018 letter.
6            (Exhibit 19 was previously
7            marked.)
8  BY MR. FORTIN:
9       Q.  Is that your signature at the bottom of
10 this letter, Mr. Bertuca?
11      A.  Yes, it is.
12      Q.  Okay. And who is this letter addressed
13 to?
14      A.  It's to: To whom it may concern.
15 Reason, it was to be issued or given to the
16 tenants of the property.
17      Q.  And in this letter, the second
18 paragraph reads: Paramount Restoration Group
19 has settled the claim with the building owner's
20 insurance company and is ready to begin repairs.
21           Did I read that correctly?
22      A.  Yes, you did.
23      Q.  So does this refresh your recollection
24 as to when you started repairs at the building?

29

1  July 18, 2018 from Vince Bertuca to a
2  garymatt38@yahoo.com.
3            Am I right so far?
4       A.  Yes, you are.
5       Q.  And the email says: Gary, please find
6  attached letter.
7            And would the attached letter be what
8  we've marked at Exhibit 19?
9       A.  Yes.
10      Q.  Okay. Thank you.
11           And who is garymatt38?
12      A.  That is Gary Hanley.
13      Q.  Okay. And then if you go to the
14 previous page, at the top there is an email from
15 Gary Hanley to yourself dated August 18 of 2018.
16           Do you see that?
17      A.  Yes.
18      Q.  Okay. And the body of that email
19 references a lake house in Michigan City,
20 Indiana.
21           Does that have anything to do with this
22 claim?
23      A.  No, it does not.
24      Q.  Okay. Prior to this claim, had you

31

1       A.  Correct. It would be the end of
2  July based on this that I'm reading. Yes.
3       Q.  All right.
4       A.  I didn't want to give that exact date
5  because I didn't know if it actually 100 percent
6  started on the 30th. I couldn't remember.
7       Q.  Sure. And when I ask for a date of
8  when something happened, feel free to qualify
9  your answer in those terms. You know, you don't
10 know the exact date but it may have been
11 around -- that's fine.
12      A.  Okay.
13      Q.  All right.
14      MR. FORTIN: I'm going to hand you
15 Exhibit 20, which is an email chain that you
16 brought with you today.
17           (Exhibit 20 was previously
18           marked.)
19 BY MR. FORTIN:
20      Q.  And since this email chain appears to
21 be in reverse chronological order as email
22 chains so helpfully are when you print them out,
23 let's start with the last page.
24           This appears to be an email dated

30

1  ever done work for Thirteen Investment or Gary
2  Hanley or Mr. Starzec?
3       A.  No.
4       Q.  And if you go to the previous page,
5  there's an email dated October 10, 2018 from
6  Mr. Hanley to yourself and it copies
7  Mr. Starzec.
8            Do you see that?
9       A.  Yes.
10      Q.  Okay. And it appears that
11 Mr. Starzec's last name would be S-T-A-R-Z-E-C?
12      MR. FORTIN: Can you confirm that,
13 Mr. O'Malley? Is that the correct spelling of
14 his last name, S-T-A-R --
15      MR. O'MALLEY: That's what it says on this
16 document but that's not what I have.
17      MR. FORTIN: Will you put an asterisk next to
18 that one in the transcript. We all know who
19 we're talking about, I guess, when we say
20 Mr. Starzec, right?
21      THE WITNESS: Correct.
22      MR. FORTIN: Okay.
23 BY MR. FORTIN:
24      Q.  This email refers to continuances/notes

32

1  based on a series of citations.
2        Can you tell me what this is in
3  reference to?
4        A.   I believe that the property owners had
5  received tickets, blight tickets, for not
6  maintaining the property.
7        Q.   Since the fire had occurred -- or let
8  me put it this way:  Between the fire in
9  May 2018 and the point in time when you started
10 repairs around the end of July, had any
11 demolition or cleanup been done at the property
12 to your knowledge?
13       A.   Just to confirm the date, you said from
14 July to October?
15       Q.   Now, I'm asking from the time the fire
16 occurred to when you started repairs.
17       A.   Had I done work --
18       Q.   To your knowledge, had anyone done any
19 cleanup or demolition at the property before you
20 started repairs?
21       A.   Oh, no demolition.  No.
22       Q.   Okay.  Had any cleanup been done?  Any
23 temporary repairs or anything like that?
24       A.   I don't believe that I did anything.

33

1  No.  No.
2        Q.   Okay.  And then if you go to the first
3  page of Exhibit 20, at the bottom there's an
4  email dated October 23, 2018 from Mr. Hanley to
5  yourself and it appears that he's referring to
6  two violations that were attached.
7        Do you recall ever seeing any
8  attachments that contained the actual
9  violations?
10       A.   I do not.
11       Q.   And the email at the very top of this
12 first page is from Mr. Hanley to yourself dated
13 October 24, 2018, correct?
14       A.   Yes.
15       Q.   Okay.  And in that email Mr. Hanley
16 says that he's available to meet at the
17 courthouse or the house to go through any
18 questions or concerns you may have.
19       Do you recall what that was in
20 reference to?  And by that, I mean were there
21 some questions or concerns that you and he
22 needed to discuss?
23       A.   To my recollection, I'm going to say it
24 was just about the violations that they had

34

1  received.
2        MR. FORTIN:  I'm going to hand you
3  Exhibit 21.
4             (Exhibit 21 was previously
5              marked.)
6        MR. FORTIN:  This is another document that
7  you brought with you today.
8  BY MR. FORTIN:
9        Q.   And this appears to be a copy of
10 Farmers' June 11, 2018 estimate for building
11 repairs with some handwriting and markup
12 throughout it.
13       Is that a fair description?
14       A.   Yes, it is.
15       Q.   Okay.  The handwriting on the first
16 page, is that yours?
17       A.   Yes.
18       Q.   And if you look at Page 3 toward the
19 bottom right of that page, you'll see an amount.
20 It looks like it was highlighted in the
21 depreciation column, the amount is $374.49.
22       Do you see that?
23       A.   Yes, I do.
24       Q.   Okay.  Is that your highlighting?

35

1        A.   I don't know if it is or isn't.
2        Q.   Okay.  Did anyone review and mark up or
3  comment on this estimate for you other than
4  yourself?  Did you ask any one of your W-9s or
5  people who worked with you to take a look at
6  this?
7        A.   Well, this actually -- yes.  This
8  document is based on meetings that took place at
9  the property with Scott Woods and a building
10 estimator.  I'm working on Paramount's behalf,
11 and they start the process of negotiating the
12 claim.  So this is a reflection of their back
13 and forth to come to a settlement.
14       Q.   Okay.  When you say their back and
15 forth, they being Scott Woods at Farmers and who
16 else?
17       A.   Correct.  It would be who wrote the
18 estimate for me who worked with Scott on this
19 one.
20       Q.   Would that be a gentleman named Mike
21 Raef, R-A-E-F?
22       A.   That's correct.
23       Q.   Okay.  Did Mike Raef actually prepare
24 an estimate for Paramount?

36

Vincent Bertuca 01/03/2020

1    A.   I don't believe he did on this one
2  because of the time that they put in on the job
3  together and worked together.  I don't know if
4  he submitted something directly to Scott or not.
5    MR. FORTIN:  I'm going to hand you Exhibit 1.
6  John, we're now on the stack of
7  documents that I prelabeled.
8    MR. O'MALLEY:  Okay.
9         (Exhibit 1 was previously
10         marked.)
11 BY MR. FORTIN:
12   Q.   Mr. Bertuca, do you recognize this as
13 the subpoena that compels your attendance here
14 today?
15   A.   Yes.
16   Q.   Okay.  And this subpoena is directed to
17 Paramount Restoration Group, Incorporated, care
18 of Anthony Bertuca, who I understand is your
19 attorney; is that correct?
20   A.   Yes.
21   Q.   Okay.  And the elder Mr. Bertuca is a
22 registered agent for Paramount, right?
23   A.   Yes.
24   Q.   Okay.  You can put that to the side.

37

1    A.   That is my sister.
2    Q.   Okay.  And what role, if any, does she
3  have in the business?
4    A.   None at all.
5    Q.   Okay.  Are there any other officers?
6    MR. BERTUCA:  No.
7    THE WITNESS:  I don't believe so.
8    MR. FORTIN:  Okay.  I'll hand you what I've
9  marked as Exhibit 3.
10        This is an earlier subpoena for
11 deposition that was issued on December 9, 2019
12 setting the deposition for December 20 of 2019.
13        (Exhibit 3 was previously
14         marked.)
15 BY MR. FORTIN:
16   Q.   Are you aware that we had previously
17 set your deposition for that date?
18   A.   You set the -- yes.
19   Q.   Okay.  And that deposition was
20 rescheduled at your and your agent's request,
21 right?
22   A.   Correct.
23   Q.   Okay.
24   MR. FORTIN:  All right.  Now, I'll hand you

39

1    A.   Okay.
2    MR. FORTIN:  I'll hand you Exhibit 2.
3         (Exhibit 2 was previously
4          marked.)
5  BY MR. FORTIN:
6    Q.   Which I'll represent to you I obtained
7  from the Illinois Secretary of State's website,
8  the curiously named CyberdriveIllinois.com.  And
9  this is what they call a corporation file detail
10 report for Paramount Restoration Group.
11        And if you look on this first page,
12 some of the information listed includes the
13 incorporation date, which is listed as
14 August 20, 2013.
15        Does that sound approximately correct
16 as to when you formed the business?
17   A.   Yes, it does.
18   Q.   Okay.  And if you'll turn to the second
19 page, it lists the officers.
20        The president, is that you there?
21   A.   Yes, it is.
22   Q.   Okay.  And the secretary is a Kathleen
23 Bertuca.
24        Can you tell me who that is?

38

1  Exhibit 4.
2         (Exhibit 4 was previously
3          marked.)
4    MR. FORTIN:  Which is an earlier subpoena for
5  deposition testimony issued on October 31, 2019
6  for a deposition scheduled on November 8.
7  BY MR. FORTIN:
8    Q.   And my question for you is:  Did you or
9  Paramount's agent ever receive this particular
10 subpoena?
11   A.   Yes.
12   Q.   Okay.  My office wasn't contacted prior
13 to the deposition date to be told that you were
14 not going to be attending and you did not attend
15 this deposition on November 8, correct?
16   A.   Correct.
17   Q.   Okay.  Can you tell me why you did not
18 attend and did not let us know that you did not
19 plan on attending?
20   A.   We weren't -- I mean -- yeah, I just
21 forgot.
22   Q.   Okay.
23   MR. FORTIN:  All right.  And last but not
24 least, I'll hand you Exhibit 5.

40



1      (Exhibit 5 was previously
2      marked.)
3  BY MR. FORTIN:
4      Q.   This was an earlier issued subpoena for
5  deposition issued on October 22, 2019 for that
6  same November 8 date.  But this one also
7  included what we called a rider which asked for
8  certain documents to be produced.
9          Do you recall ever receiving this
10 subpoena?
11     A.   No.
12     Q.   Okay.  If you turn to the last page of
13 that exhibit, there's a list of documents
14 requested.
15         Do you recall ever seeing this list of
16 documents requested by my office from Paramount?
17             (Short pause.)
18     MR. BERTUCA:  That's what I told you about.
19     THE WITNESS:  Yes.
20     MR. FORTIN:  Okay.
21 BY MR. FORTIN:
22     Q.   And I did not receive any documents
23 from Paramount prior to today, but you did bring
24 with you the documents that I marked and that we

41

1 that we had been using for access.  And the --
2 after various text messages, phone calls trying
3 to reach out, trying to reach out, having people
4 sit for close to two hours with material, we
5 were then informed that we were fired off this
6 job by the building owner.  And so that's what
7 his attorney told him to do.  I said I have all
8 the cabinets and countertops outside of your
9 house.  And he told me in not so many words to
10 stick 'em up my ass.  And I said we still have
11 stuff in there.  He said, well, my attorney told
12 me to lock the door.  I said okay.  And he hung
13 the phone up.
14     Q.   And who is the he that you're referring
15 to?
16     A.   Mike.
17     Q.   Mike at Thirteen Investment?
18     A.   That's correct.
19     Q.   And approximately when was this that
20 you were locked out of the site?
21     A.   Can I look at my phone?
22     Q.   Absolutely.
23             (Short pause.)
24     THE WITNESS:  September 4.

43

1 looked at earlier that were Exhibits 14 through
2 21.
3          Can you tell me what role, if any, you
4 had in gathering those documents does be provided
5 here today?
6      A.   Simply just going through files.
7      Q.   Okay.  Do the exhibits marked
8  Exhibits 14 through 21 comprise Paramount's
9  entire file relating to this claim?
10     A.   No, it does not.
11     Q.   Okay.  What other documents or
12 communications or materials does Paramount have
13 that it would consider to be part of this claim?
14     A.   There is a folder that was on the job
15 site with job notes in it and various other
16 documents in it.
17     Q.   Okay.  Anything else?
18     A.   That would be it.
19     Q.   Okay.  What happened to that or that
20 folder that was on the job site?
21     A.   Upon a kitchen cabinet and granite
22 countertop delivery, we -- my -- the people that
23 came to start installing and deliver, the
24 padlock was changed on the front of the building

42

1 BY MR. FORTIN:
2      Q.   Of 2019?
3      A.   Correct.
4      Q.   During the course of the adjustment of
5  the insurance claim, would you ever communicate
6  with the insureds via email?
7      A.   Well, Gary, I brought.  I don't recall
8  if I did with Mike.
9      Q.   The emails that we looked at which I
10 think were marked as Exhibit 20, the earliest of
11 those was July of 2018.
12         Do you recall if you had any email
13 communication with Mr. Hanley or Mr. Starzec
14 prior to July of 2018?
15     A.   I didn't find anything when I looked it
16 up.
17     Q.   Okay.  And how did you go about finding
18 the emails that you did bring with you today?
19     A.   Looked through my old emails.
20     Q.   And what email server or software do
21 you use?  Outlook?  Gmail?
22     A.   Yahoo.
23     Q.   Yahoo.  Okay.
24         So you can log onto your email account

44

1  and search through prior emails?
2     A.  Yes.
3     Q.  Did you use any particular search terms
4  to locate the emails you produced today or did
5  you find those in a specific folder or how did
6  you go about locating them?
7     A.  Typed in Gary and went to find the
8  emails.
9     Q.  Okay.  Did you by any chance search for
10  the terms Euclid or Farmers or 13, for instance?
11     A.  I believe I did.  Yes.
12     Q.  And the only emails that your searches
13  turned up were the ones that you produced today,
14  right?
15     A.  Correct.
16     MR. FORTIN:  All right.  I'm going to hand
17  you Exhibit 6, which is a copy of Paramount's
18  contract with Thirteen Investment that I had
19  previously been provided by my client.
20            (Exhibit 6 was previously
21              marked.)
22  BY MR. FORTIN:
23     Q.  Do you recognize this as being the same
24  document that we had previously looked at as

45

1  part of Exhibit 16?
2     A.  Yes.
3     Q.  Okay.  Is this a standard form of
4  contract that Paramount uses?
5     A.  Yes.
6     Q.  Is the handwriting on the first page of
7  Exhibit 6 yours?
8     A.  Yes.
9     Q.  Okay.  And this contract basically
10  entitles Paramount to a 10 percent fee of the
11  total adjusted claim unless Paramount is allowed
12  to perform the repairs, right?
13     A.  Correct.
14     Q.  And so if Paramount does the repairs
15  and the 10 percent fee is waived, does Paramount
16  essentially end up making its money by whatever
17  profit they gain on doing the job?
18     A.  That's correct.
19     Q.  Okay.  If you'll turn to the second
20  page, there is a signature line above the name
21  Vincent A. Bertuca.
22        Is that your signature?
23     A.  Yes.
24     Q.  Okay.  And you signed this document on

46

1  May 17, 2018?
2     A.  Correct.
3     Q.  Okay.
4     MR. FORTIN:  If you'll turn to -- or no.
5  I'll turn to, because I have a binder of my
6  exhibits, but I'll hand you Exhibit 7.
7             (Exhibit 7 was previously
8              marked.)
9  BY MR. FORTIN:
10     Q.  And do you recognize Exhibit 7 as a
11  May 18, 2018 letter that you received from Scott
12  Woods at Farmers?
13     A.  Yes.
14     Q.  Okay.  And that letter encloses what's
15  called a tax and demolition form.
16        Are you familiar with what that is?
17     A.  Yes.
18     Q.  Okay.  What's your understanding of
19  what a tax and demolition form is?
20     A.  The main thing is to -- if people don't
21  repair the building, a lot of municipalities do
22  a hold.  So if people don't repair it, that they
23  don't have a vacant building.
24     MR. FORTIN:  If you'll turn to Exhibit -- I

47

1  did it again.  I'm just going to hand you
2  Exhibit 8, which appears to be a completed tax
3  and demo form.
4             (Exhibit 8 was previously
5              marked.)
6  BY MR. FORTIN:
7     Q.  Do you recognize this document?
8     A.  Yes.
9     Q.  Does your signature appear anywhere on
10  this document?  It's not a trick question --
11     A.  No.  No.  I was looking.  I didn't
12  know.
13     Q.  Okay.  Towards the bottom, it appears
14  that this document was notarized by Anthony T.
15  Bertuca.
16        And would that be your father?
17     A.  Yes.
18     Q.  And do you recognize that as being his
19  signature?
20     A.  Yes.  It's a stamp.
21     Q.  Well, there's a stamp, but then the
22  name is also written in there right above the
23  stamp?
24     A.  Yes.  Yes.

48



1    Q.   Do you recognize that as being his
2  handwriting?
3       MR. BERTUCA:  Yes.
4       THE WITNESS:  Up here?
5       MR. BERTUCA:  There.
6       THE WITNESS:  Yes.
7       MR. FORTIN:  Okay.
8  BY MR. FORTIN:
9    Q.   Did you have any role in filling out or
10 completing this document?
11      A.   Absolutely.
12      Q.   Okay.  And then this document was
13 submitted to Farmers, right?
14      A.   Correct.
15      Q.   Okay.
16      MR. FORTIN:  Now I will hand you Exhibit 9.
17              (Exhibit 9 was previously
18                marked.)
19 BY MR. FORTIN:
20      Q.   Do you recognize Exhibit 9 as a
21 June 14, 2018 letter that you received from
22 Scott Woods at Farmers?
23      A.   Yes.
24      Q.   Okay.  And did you understand this

                                                    49

1  letter to detail the settlement of the contents
2  portion of the loss?
3       A.   Yes.
4       Q.   Was the amount that Farmers paid for
5  the contents portion of the loss, which was
6  $5,288.50, was that an agreed figure or was that
7  in dispute?
8       A.   It was agreed.
9       Q.   Okay.  And did you subsequently receive
10 a check for that amount from Farmers?
11      A.   Yes.
12      Q.   Okay.
13      MR. FORTIN:  I'm going to hand you what's
14 been marked as Exhibit 13.
15              (Exhibit 13 was previously
16                marked.)
17      MR. FORTIN:  And let me know if you recognize
18 the check at the top of Exhibit 13 as the
19 contents check that you received from Farmers.
20      THE WITNESS:  Yes, I do.
21      MR. FORTIN:  Okay.
22 BY MR. FORTIN:
23      Q.   And that check names Thirteen
24 Investment and Paramount Restoration Group as

                                                    50

1  payees, correct?
2       A.   Correct.
3       Q.   Okay.  And was this check deposited?
4       A.   (No audible response.)
5       Q.   Or let me ask a better question.
6            What if anything did you do with this
7  check after receiving it?
8       A.   I'm trying to recall because --
9       Q.   Sure.  Take your time.
10      A.   This stuff was actually in the folder
11 at the house.
12      Q.   When you say this stuff, can you be
13 more specific?
14      A.   These documents -- some of these
15 documents I didn't have available because they
16 were on the job site.
17      Q.   Okay.  Meaning correspondence with
18 Farmers and copies of checks?
19      A.   For example, for sure I know that this
20 printout --
21      MR. BERTUCA:  Tell him in what exhibit.
22      THE WITNESS:  In Exhibit 9, Page 3 with the
23 pricing.
24      MR. FORTIN:  Okay.

                                                    51

1       THE WITNESS:  I know for sure was at the job
2  site only because when I did the walk-through to
3  order and get all the cabinets, we were
4  measuring for fittings, you know, refrigerator.
5  Because some of the dimensions are on here.  So
6  I was making sure that we were getting the right
7  sizes.
8       MR. FORTIN:  Okay.
9  BY MR. FORTIN:
10      Q.   And so the question that's pending is:
11 what if anything did you do with this check when
12 you received it?
13      A.   It looks like we cashed it.
14      Q.   When you say we, do you mean Paramount?
15      A.   Correct.
16      Q.   Do you know what bank you cashed it at?
17      A.   It says on the check here that it was
18 cashed at a currency exchange where we have a
19 business account.
20      Q.   Which currency exchange is that?  Is
21 that the Elmwood Park Currency Exchange?
22      A.   That's correct.
23      Q.   You say you have a business account
24 there?

                                                    52

Vincent Bertuca 01/03/2020

1    A.  Yes, I do.
2    Q.  Is that the same as -- I mean do you
3  have a bank account with the Elmwood Park
4  Currency Exchange?  Is that what that means?
5    A.  No.  I have a business account at the
6  currency where they are familiar with the
7  industry that I go there to process money.
8    Q.  Okay.  And with that account, do you
9  actually cash the check and receive cash for it
10 or does it deposit it into an account?
11   A.  No.  You can't walk away -- this check
12 you could have, but I didn't.  I'm just
13 guessing, but you can't walk out with more than
14 a certain cash amount.
15   Q.  Because they don't let you or
16 because -- I'll withdraw the question.
17      So with this particular check when you
18 brought it to the Elmwood Park Currency
19 Exchange, was it deposited into an account?
20   A.  No.
21   Q.  Did you receive cash?
22   A.  I don't know a hundred percent what we
23 received.  Generally, a lot of money orders are
24 issued based on the -- where the money is going
                                              53

1  to be allocated to go to.
2    Q.  Okay.  So it was not deposited directly
3  into an account.
4       Are you certain of that?
5    A.  Yes, I am.
6    Q.  Okay.  But you think a money order may
7  have been issued?
8    A.  Multiple -- or multiple.
9    Q.  Okay.  And how does that work?  It
10 would have been money orders, multiple ones?
11 Like one to each payee for instance?
12   A.  Yes.  It would be multiple based --
13 where money needed to go on the job.
14   Q.  Okay.
15   A.  For example, if an electrician needed
16 money for something -- not necessarily based off
17 of this check, but I would have the amount that
18 he needed printed.
19   Q.  So you have a money order made out to
20 that individual for the amount that they were
21 supposed to get?
22   A.  Correct.
23   Q.  Okay.  Do you recall whether you
24 obtained any money orders in exchange for this
                                              54

1  check?
2    A.  I do not.
3    Q.  Okay.  Are receiving cash or obtaining
4  money orders the only two possibilities?
5    A.  Yes.  That I know of.
6    Q.  Okay.  So since you know you didn't
7  deposit it directly into an account, then you
8  would have either received cash or money orders?
9    A.  Yes.
10   Q.  Okay.  Does Paramount have a bank
11 account somewhere that it uses for business
12 purposes?
13   A.  Not at this time.  We did.  I closed
14 the account because it got hacked so bad, we
15 were -- it was almost like an identity theft
16 that happened with the bank account.  It was an
17 absolute nightmare.
18   Q.  So as of June 2018, did Paramount have
19 a bank account?
20   A.  No.
21   Q.  Okay.  So you had closed that bank
22 account before receiving this particular check
23 around June 14, 2018?
24   A.  I couldn't -- the exact date of closing
                                              55

1  I don't recall, but yes.
2    Q.  Okay.  And what bank was it that you
3  had that account at?
4    A.  Bank of America.
5    Q.  Does Paramount have any bank accounts
6  as we sit here today?
7    A.  No.
8    Q.  So what do you do with any funds that
9  Paramount receives?  Where do they go?
10      If you were to receive a check for the
11 10 percent of your fee for adjusting a claim,
12 for instance --
13   A.  Okay.
14   Q.  -- what do you do with that check?
15   A.  A 10 percent fee.  So that would come
16 from the insured?
17   Q.  Sure.
18   A.  Cash it -- or get money orders printed
19 on it based on what we needed at that moment.
20   Q.  Do you personally have a bank account?
21   A.  No.
22   Q.  So at the end of a job, ideally
23 Paramount has some money left over, right, that
24 reflects its profit?
                                              56

1  A.  Ideally.  That's the goal.
2  Q.  I understand it doesn't always work out
3  that way.
4  A.  Sometimes it doesn't work that way.
5  Q.  But when it does work that way and
6  there's money left over and that's Paramount's
7  profit, then what do you do with that money?  I
8  mean does it go under a mattress?  Do you just
9  hold on to a money order in that amount?
10  A.  A lot of times I'll keep money orders
11  in a safe that you have to be very careful with
12  because they are blank on some of those and if
13  you lose them, it's like losing cash.  So I'm
14  very careful with that.
15      But any income gained on a job goes
16  right back into another job or into the company
17  to pay bills, to pay creditors, to pay vendors.
18  Q.  All right.  And so those funds that go
19  into the company, in what form are they held?
20  In just various money orders?
21  A.  Yes.
22  Q.  So they're not in a bank account
23  anywhere?
24  A.  No.

57

1      job at that time, other people would have.  You
2  know, and I always -- I can't do everything.  So
3  I do get help with assisting processing money.
4  Q.  Okay.  At this point in time,
5  June 2018, who else may have been the one who
6  brought this check to the currency exchange?
7  A.  It could have been one of three people.
8  Q.  Can you tell me their names?
9  A.  One would have been a Jorge or George
10  Suarez.
11  Q.  S-U-A-R --
12  A.  -- E-Z.
13  Q.  Who are the other two?
14  A.  The other would have been a Scott
15  Swanson.
16  Q.  And the third?
17  A.  It may just be those two at this time.
18  I'm just trying to recollect.
19  Q.  Okay.  And if you think of the third
20  person later on, just let me know.
21      Did Paramount obtain Thirteen
22  Investment's endorsement on this check?
23  A.  I'm sorry.  Could -- did I what?
24  Q.  Did Thirteen Investment sign the back

59

1  Q.  On Exhibit 13, it shows the back of the
2  check with the endorsements.
3      Do you see that?
4  A.  Yes.
5  Q.  Okay.  Do you recognize any of the
6  signature lines there?
7  A.  It's awfully messy.
8      Yes.  I can see my V.A. on the bottom.
9  Q.  Can you point out to me where your --
10  A.  I'm sorry.  That looks like where they
11  did their stamp.
12  Q.  Is that a blue pen you have there?
13  A.  Yes, it is.
14  Q.  Would you do me a favor and circle the
15  V.A.
16  A.  (Indicating.)
17  Q.  Thank you.
18      Did -- let me rephrase that.
19      Are you the individual who would have
20  brought this check to the Elmwood Park Currency
21  Exchange?
22  A.  Not necessarily.
23  Q.  Who else may have done that?
24  A.  Depending on who was helping with the

58

1  of this check before you brought to it the
2  currency exchange or before someone brought it
3  to the currency exchange on your behalf?
4  A.  It looks that way.
5  Q.  Okay.  Where -- which signature do you
6  see that would have been theirs?
7  A.  I honestly don't know because it's so
8  messy.  There's so...
9  Q.  The currency exchange wouldn't allow
10  you to negotiate a check without the endorsement
11  of each of the payees on it, right?
12  A.  Oh, no.  It has to be endorsed.
13  Q.  Okay.  So if you walked in there with
14  just your endorsement on it, they wouldn't give
15  you a money order, they wouldn't give you cash,
16  right?  Because they would need the other
17  payee's endorsement?
18  A.  That's correct.
19  Q.  Okay.
20  A.  Unless someone made a mistake at the
21  window.  But that normally doesn't happen.
22  Q.  Sure.
23      Do you have any recollection as to
24  whether you obtained Thirteen Investment's

60

1  signature on this check before cashing it at the
2  currency exchange?
3      A.   I don't.
4      Q.   You mentioned you have a business
5  account at the currency exchange?
6      A.   That's correct.
7      Q.   Okay.  So was that something that has
8  like an actual account number?
9      A.   No.  But they have copies of like our
10 articles of incorporation that they know we're a
11 legitimate business.
12     Q.   Are you able to obtain records of your
13 previous transactions from the currency
14 exchange?
15     A.   I don't know.
16     MR. FORTIN:  I'm going to hand you
17 Exhibit 10.
18             (Exhibit 10 was previously
19                marked.)
20 BY MR. FORTIN:
21     Q.   And do you recognize Exhibit 10 as a
22 June 22, 2018 letter that you received from
23 Scott Woods at Farmers?
24     A.   Yes.

61

1      Q.   Okay.  And did you understand this
2  letter to outline the settlement of the building
3  portion of the claim?
4      A.   Yes.
5      Q.   Okay.  And on the first page, it lists
6  a settlement amount of $150,601.33, correct?
7      A.   That's correct.
8      Q.   Was that an agreed amount?
9      A.   Yes.
10     Q.   Okay.  Agreed between Paramount and
11 Farmers?
12     A.   That's correct.
13     Q.   And Paramount was acting pursuant to
14 its contract with Thirteen Investment in
15 negotiating the settlement at that amount?
16     A.   Acting as a public adjuster.
17     Q.   Okay.
18     MR. FORTIN:  And I'll hand you Exhibit 11.
19             (Exhibit 11 was previously
20                marked.)
21 BY MR. FORTIN:
22     Q.   This is another June 22, 2018 letter to
23 yourself from Scott Woods at Farmers enclosing
24 the itemized estimate for the building repairs.

62

1          Do you recall receiving this?
2      A.   Yes.  I believe this was via email.
3      Q.   Okay.
4      MR. FORTIN:  And now I'll hand you
5  Exhibit 12.
6             (Exhibit 12 was previously
7                marked.)
8  BY MR. FORTIN:
9      Q.   And do you recognize Exhibit 12 as the
10 check issued by Farmers on June 22, 2018 in the
11 amount of $150,601.33 representing the
12 settlement of the building portion of the claim?
13     A.   Yes.
14     Q.   Okay.  And did you receive this check?
15     A.   Yes, we did.
16     Q.   And what, if anything, did you do upon
17 receiving it?
18     A.   Process it.
19     Q.   What does that mean?
20     A.   Get the -- start.
21          I'm just looking here.
22          Get the appropriate paperwork into
23 where it needed to go and start the job.
24     Q.   What does the appropriate paperwork

63

1  consist of?
2      A.   Well, a lot of it is based on what
3  Scott sent to us as I'm looking at.  And, you
4  know, a copy does get sent to the insured.  So
5  then what I did with that was we then did a walk
6  through on the job.  I informed him that this
7  check had been received.
8      Q.   When you say him --
9      A.   Mike and Gary who we met at the job.
10     Q.   Okay.
11     A.   Informed that this check had been
12 received and he said yes, go ahead and do what
13 you need to do with it.
14     Q.   Who was that?
15     A.   Mike.
16     Q.   Did you have the check with you?
17     A.   I did not.  I did not receive it in the
18 mail myself.  Someone went to the mailbox that
19 day and had gotten the check.
20     Q.   Someone on your behalf?
21     A.   Correct.
22     Q.   And so you were on site with -- you
23 said with Gary and Mike?
24     A.   Correct.  Going through on an ACV

64

1  policy where there's no code, it makes more
2  sense to just be real clear with what the
3  numbers are because it's -- they're tough. It's
4  a tough repair. So that's why we did it that
5  way. And I believe that we had this with us,
6  the actual numbers.
7      Q.  Okay. And when you say this, you're
8  referring to Exhibit 11?
9      A.  Exhibit 11.
10     Q.  Okay. And while on site, you told Gary
11 and Mike that you had received this $150,000
12 check from Farmers?
13     A.  Yes. And, in fact, I remember Mike
14 saying yes, I saw -- I got the letter sent to
15 me. Because he gets notified as well.
16     Q.  Right.
17         And what, if anything, did they tell
18 you to do with the check?
19     A.  Mike said go ahead and do what you have
20 to do to get it rolling which would indicate
21 to -- as a public adjuster, there are a lot of
22 instances where we have an okay to sign stuff
23 for our insureds. If you had to meet for every
24 single document, you would be even more behind

65

1  on jobs.
2      Q.  Okay. So did you understand -- let me
3  take a step back.
4          Do you recall was it Mike or Gary who
5  said that to you?
6      A.  Mike.
7      Q.  Okay. And did you understand that
8  statement from Mike to mean that Paramount was
9  authorized to endorse this check on Thirteen
10 Investment's behalf?
11     A.  Definitely.
12     Q.  And did Paramount, in fact, do that?
13     A.  It looks that way. Yes.
14     Q.  Okay. Because it looks like -- the
15 first endorsement on the back of the check, it
16 looks like it says Mike Starzec?
17     A.  Correct.
18     Q.  Okay. Do you or can you make out
19 what's written below that?
20     A.  It looks like it says Thirteen
21 Investment Company.
22     Q.  Okay. And on the next line, can you
23 make out what that says? It looks like a
24 capital P at the beginning?

66

1      A.  That's all that I can see.
2      Q.  Do you see your signature anywhere?
3      A.  No.
4      Q.  Okay. Do you know whose signature that
5  is on the bottom directly under the words
6  Elmwood Park Currency?
7      A.  I do not. I can't tell who that is.
8  It looks -- is that a J? I...
9      Q.  In any event, it appears that someone
10 from Paramount brought this check to the Elmwood
11 Park Currency Exchange, right?
12     A.  Correct.
13     Q.  Do you recall who it was that brought
14 this check to the currency exchange?
15     A.  This had to be Shawn. I'm going to say
16 Shawn did this. Shawn Jacob.
17     Q.  Shawn Jacob?
18     A.  Uh-huh.
19     Q.  Does he spell Shawn the correct way or
20 the wrong way?
21     A.  I don't know what's right or wrong with
22 Shawn.
23     Q.  Well, how does he spell Shawn?
24     A.  S-H --

67

1      Q.  S-H-A-W-N?
2      A.  Yes.
3      Q.  And last name Jacob?
4      A.  Uh-huh.
5      Q.  What sort of jobs or services did Shawn
6  or does Shawn do for Paramount?
7      A.  He would really help me with
8  collections, processing money. He was a good
9  public relations as far as, you know, meeting
10 new people. He was from a different area. We
11 knew each other from college and...
12     Q.  Do you have a physical address for
13 Shawn?
14     A.  I do not. And I don't think there is
15 one anymore. He committed suicide.
16     Q.  I'm sorry to hear that.
17         Do you know approximately when?
18     A.  Last month.
19     Q.  Okay.
20     A.  Two months ago.
21     Q.  So Shawn brought the check to the
22 Elmwood Park Currency Exchange. And do you know
23 what he received for it, whether -- did he get
24 cash, money orders or what?

68

Vincent Bertuca 01/03/2020

1    A.   Well, you couldn't get that much cash.
2  So it had to be money orders that he would have
3  had a good inventory of what we needed to start
4  getting them printed.  And he had an
5  authorization there to do that there.  They knew
6  him.
7    Q.   Would he have done that under
8  Paramount's business account?
9    A.   I would guess so.  Yes.
10   Q.   Did Paramount ever communicate with
11 anyone at the mortgagee?
12   A.   Shawn would do that stuff.
13   Q.   Did you ever communicate with the
14 mortgagee that's listed on this check as a
15 payee?
16   A.   No, I did not.
17   Q.   Do you know if Shawn did?
18   A.   I believe he did.  Yes.
19   Q.   And what's the basis for you believing
20 that he did?
21   A.   Because it was endorsed.
22   Q.   Where do you see -- are you saying that
23 you think one of the endorsements is the
24 mortgagee's endorsement?

69

1  No, I don't.
2    Q.   Is there any way for you to find out?
3    A.   I believe so.  Yes.  I would have to go
4  through copies and try to tie them with the
5  particular job it was for.
6    Q.   Go through copies of what?
7    A.   The money orders.
8    Q.   So when you get a money order and then
9  you paid out to vendors or subs, do you retain a
10 receipt or a counter copy of that money order?
11   A.   A lot of times I try to -- what I
12 always do is keep a log of the money order, who
13 it was issued to, what it's for.
14   Q.   Okay.  So you would have -- you should
15 theoretically have a log that reflects the money
16 orders that were disbursed from the funds
17 represented in this check?
18   A.   Yes.  And at times there also may be
19 from the checks, for example, if it was a big
20 payment I had to -- on a card that we use for
21 stuff.
22   Q.   Sometime following your deposition
23 today, can you provide a copy of that log that
24 would show how the funds reflected in this check

71

1    A.   I'm looking at -- right here -- this
2  here.  That looks like a stamp to me
3  (indicating).
4    Q.   So you're looking at, I guess, it's a
5  faded printing in about the middle of the check
6  on the back?
7    A.   Correct.
8    Q.   Other than that stamp that you're
9  pointing to, do you have any other reason to
10 believe that Shawn communicated with the
11 mortgagee prior to bringing this check to the
12 currency exchange?
13   A.   He told me he did.  He told me he took
14 care of everything.
15   Q.   Okay.  I want you to try as
16 specifically as you can to recall exactly what
17 he said.  Did he say I spoke with the mortgagee?
18 Did he reference the mortgagee explicitly at
19 all?
20   A.   I don't remember.
21   Q.   Okay.  Do you know what, if any, money
22 orders Shawn got when he brought this check to
23 the currency exchange?
24   A.   I don't know off the top of my head.

70

1  were distributed?
2    A.   Yes.  We could find that.
3    Q.   Thank you.
4    A.   I do think a lot of it was at the job.
5    Q.   Yes.  And that's --
6    A.   Because I brought a folder with me
7  there that I normally wouldn't and the reason
8  was is because I wanted -- it was two-fold.  The
9  cabinets were a very pressing issue that they
10 needed to be an extremely high grade.  That was
11 a very big issue.  So I wanted the numbers with
12 me.  I wanted the measurements with me, exactly
13 what was paid.  And I kept track of that job in
14 this folder.
15   Q.   And is that folder what was at the
16 property?
17   A.   Yes.
18   Q.   Did you ever ask Thirteen Investment
19 for that folder back?
20   A.   When I did, he hung the phone up on me.
21   Q.   And who is he specifically?
22   A.   Mike.  And that was my last day I had
23 communication with him was that September date
24 that I gave earlier in my deposition.

72

1    Q.   The September date was when they fired
2 you from the job?
3    A.   Correct.
4    Q.   Okay.
5    A.   But we had stuff in there still.
6 Ladders.  I couldn't name line by line the
7 additional items that were in the job site.
8    Q.   Okay.  Did any portion of the $150,000
9 check get distributed to Thirteen Investment?
10    A.   Not that I recall.
11    Q.   Okay.  Did any portion of the check get
12 distributed to the mortgagee?
13    A.   I don't believe so.
14         There are instances when on an ACV
15 policy, to give you an example on this claim,
16 what was essentially paid for demolition, for
17 example, and cleanout -- okay.  So if you go
18 to --
19    Q.   And we're looking at Exhibit 11,
20 correct?
21    A.   Exhibit 11, Page 53.
22    Q.   Okay.
23    A.   That interior cleanup number --
24    Q.   Are you looking at a particular line

73

1    the policy how it's written, no fault of --
2 that's just how the policies go, additional --
3 you're forfeiting about 30,000.  And when you
4 also take into account the no municipal code
5 upgrade.  So you explain that to -- there's an
6 understanding that...
7    Q.   The actual job is going to cost more
8 than the settlement?
9    A.   Well, not necessarily more than the
10 settlement.  But that amount of money, you would
11 be -- you're looking at almost $20,000 which is
12 double just in interior demolition.  So when
13 they see that, there's an understanding to help
14 process things quicker.  I've experienced it a
15 number of times.
16    Q.   Was Paramount acting as a general
17 contractor for the repairs or was it doing the
18 work itself as its own contractor?
19    A.   Well, Paramount doesn't do the
20 mechanicals.  I'm not a licensed electrician.
21 I'm not a licensed plumber.  I'm not a licensed
22 HVAC.  So those are --
23    Q.   Those are subbed out?
24    A.   100 percent.  They have to be.  You

75

1 item?
2    A.   I'm sorry.  If you go up -- if you look
3 where it says generals?
4    Q.   Yep.
5    A.   That's specifically for, you know,
6 cleanout, the demolition.
7         The number was very off, but no fault
8 of the insurance company.  And really no fault
9 of anyone's but the tenants.
10         The tenants left so much debris and
11 contents.  And I think they used it as a garbage
12 area for some time.  I couldn't describe to you.
13         So, for example, where -- and for all
14 intents and purposes, the two dumpster loads
15 would be acceptable, I think based on just the
16 contents, the additional contents alone, we were
17 looking at almost eight dumpsters there.  I mean
18 we just kept filling them up.  There was so much
19 stuff in this house.  Mattresses, furniture,
20 shoes, clothes, garbage.
21         So based on that as an example, there's
22 an area where the demolition is really going to
23 exceed what's been allotted.  On an ACV policy
24 when you're essentially forfeiting because of

74

1 can't --
2    Q.   Right.
3    A.   I mean even as far as demolition, I use
4 a demolition company.
5    Q.   Did Thirteen Investment enter into a
6 separate contract with Paramount for the
7 repairs?
8    A.   Yes.
9    Q.   Okay.
10    A.   That's in the folder.
11    Q.   So there's a written contract?
12    A.   Yes.
13    Q.   Okay.  And to the best of your
14 recollection, what were the terms of that
15 contract?  I mean did it layout a bottom line
16 cost for the project?
17    A.   Oh, no.  We're based on the insurance
18 proceeds.
19    Q.   So the contract would say we'll do the
20 work for --
21    A.   Based on your insurance proceeds.
22    Q.   Okay.  And that includes making
23 necessary code upgrades and doing the central
24 heat and air?

76

1    A.   Unfortunately it did, yes.
2    Q.   Okay.  And does that contract also
3  reflect that Paramount was waiving its
4  10 percent fee?
5    A.   I don't think it's on that contract
6  because it's on the initial agreement.
7    Q.   But that at least was your
8  understanding, though, that because you were
9  doing the repairs, you weren't going to collect
10  that 10 percent fee?
11    A.   If you do the repair and complete the
12  repair, then there would be no fees.
13    Q.   About how much of the project was done
14  before they fired you?
15    A.   A lot.  We were installing kitchen
16  cabinets and countertops and ready to start
17  doing trim work.
18    Q.   And would you say -- could you give
19  me -- would you say you were 70, 80, 85 percent
20  done?
21    A.   75 to 80.  Full drywall completed.  I
22  could kind of go through if you want.
23    Q.   It's not necessary at this point.
24         Did you have a record of how much the

77

1  job had cost you thus far?
2    A.   A pretty good idea.  Yes.
3    Q.   How much?
4    A.   We were over a hundred already.  Well
5  over a hundred.
6    Q.   Prior to Thirteen Investment
7  terminating or firing you, was there any
8  indication that they were dissatisfied with the
9  work or any disagreements of any kind or was
10  this just out of the blue?
11    A.   The only negative feedback that I
12  received was at -- was just on the time it was
13  taking to complete the repair.  What I kept
14  trying to remind was we did a very large amount
15  of additional work that isn't on here.
16    Q.   And when you say on here, you're
17  referring to the scope in Exhibit 11?
18    A.   I'm sorry.  To Exhibit 11.  A lot that
19  is not on Exhibit 11.
20    Q.   Other than the conversation you had
21  with Gary and Mike at the site after receiving
22  the check for the building portion of the claim,
23  other than in that conversation, have you ever
24  had a conversation with Gary or Mike about the

78

1  proceeds paid by Farmers or that $150,000 check?
2    A.   Yes.
3    Q.   Can you tell me -- just tell me
4  generally about what those conversations
5  consisted of.
6    A.   (No audible response.)
7    Q.   If it's --
8    A.   It was never with Gary.  It was one
9  conversation with Mike.  He thought, which I
10  never heard of this, that the insurance company
11  was paying us draws off the check.  That's what
12  he claimed.  To the best of my recollection,
13  this was a phone call.  And when I explained to
14  him no, this is not how it went, he then said
15  well, who signed my name.  I said, Mike, you
16  told me it was okay.  It was so nonchalant.
17  There was a hand wave like you would do -- like
18  go ahead, yes, I got the letter.
19    Q.   You're referring to when you guys were
20  on --
21    A.   Absolutely.  And it was like talking
22  to -- and I'll say this, that was when we had
23  started all the additional HVAC work.
24    Q.   Do you recall roughly when this phone

79

1  call was with Mike?
2    A.   February/March.
3    Q.   Of 2019?
4    A.   Yes.
5    Q.   And what would that mean being paid
6  draws off the check?
7    A.   I don't know what he meant.
8    Q.   And so you told him no, we --
9    A.   Correct.
10    Q.   -- received the check and you told us
11  it was okay to sign it?
12    A.   Correct.
13    Q.   What if anything did he say after that?
14    A.   I don't remember exact.  An awful lot
15  of swearing and screaming at me.  A lot of
16  threats.
17    Q.   Do you recall any specific threats that
18  he made?
19    A.   Something about that his niece is a
20  big-time lawyer and he's going to take me to
21  court and she gets pro bono legal work.
22  Something of those -- and to be honest, I just
23  kind of listened.  I didn't know if he had been
24  drinking or what.  It was late in the evening

80



1 and I was just caught off guard by the entire
2 phone call.
3     Q.   Do you have any sense as to what he was
4 upset about?
5     A.   He claimed that he had called the
6 insurance company, and then he said well, I
7 never saw this check.  I said Mike, you got the
8 letter from the insurance.  I told you about
9 this check.
10     Q.   Have you had any communications with
11 him since that phone call?
12     A.   No.  I have not because I was
13 instructed by him not to call and I would
14 receive contact from his lawyer.
15     Q.   Did you subsequently receive any
16 contact from his lawyer?
17     A.   I did not.
18     Q.   Other than that phone call and the
19 conversation you had with Mike and Gary on site
20 after receiving the check, have you had any
21 other communications with anyone from Thirteen
22 Investment regarding the insurance proceeds paid
23 by Farmers?
24     A.   Well, I would explain -- after this

81

1     A.   Typically, yes.
2     Q.   And where do you keep those blank money
3 orders?
4     A.   In a safe.
5     MR. FORTIN: We've been going for about
6 two hours.  I think those are about all the
7 questions I have for you, but let's take a
8 10-minute break.  I'm going to go through my
9 notes and make sure I don't have anything else
10 for you and then we'll come back and
11 Mr. O'Malley may have some questions for you
12 based off that.
13     THE WITNESS:  Fair enough.  Fair enough.
14     MR. FORTIN:  But thank you so far.
15          (whereupon, a short break was
16           taken.)
17     MR. FORTIN:  Back on the record.
18 BY MR. FORTIN:
19     Q.   Mr. Bertuca, since that I'll call it
20 adversarial conversation that you had with I
21 believe it was Mike back in like February or
22 March of 2019?
23     A.   Yes.
24     Q.   Since then, have there been any

83

1 phone call on a few occasions, I explained the
2 refresher course of how an actual cash value
3 policy works.  But I -- it was over the kitchen
4 cabinets.  And I felt that Farmers gave a very
5 fair offer for the kitchen cabinets.  And we
6 were able to come close with the price.  It was
7 just a lot of cabinetry that needed to be
8 purchased that never got delivered -- or never
9 got into the house because we got locked out.
10     Q.   Is any portion of the $150,000 and
11 change paid by Farmers still left?
12     A.   I'd have to go through the books on it.
13 I don't know.
14     Q.   Okay.
15     A.   If I gave you an answer, it wouldn't be
16 truthful.
17     Q.   So you would have to go through the
18 books and see if the money orders you've
19 disbursed add up to 150 or not?
20     A.   Correct.
21     Q.   Okay.  And if they -- if hypothetically
22 they did not, say they added up to 110, where
23 would that other 40,000 be?  Would it be in the
24 form of blank money orders somewhere?

82

1 communications with Thirteen Investment about
2 them wanting you to return to them any money or
3 saying you owe us this or you owe us that?
4     A.   Never -- I take that back.  When he
5 told me I was fired off the job, he made a
6 mention of that.  But he said he wanted
7 $150,000.
8     Q.   So he said you're fired and you owe me
9 150 grand?
10     A.   That's what he told me.
11     Q.   Did he say why he thought you owed him
12 150 grand?
13     A.   When I said why would I do that, I
14 don't recall his answer.  I was very caught off
15 guard that I had granite and cabinetry outside
16 of a house and no way of getting in and just to
17 find out.  So I was a little distracted with the
18 conversation.
19     Q.   Have you put a lien on the property?
20     A.   No, I have not.
21     Q.   Why not?
22     A.   I didn't do anything on a negative
23 standpoint based on I was waiting to see some
24 sort of a response.  I even left the electric on

84



1 there longer because I didn't want to get ComEd
2 out to cut the power.
3         To be honest, in my mind I thought I
4 have $14,000 worth of kitchen -- more than that,
5 $16,000 worth of kitchen cabinets that I have no
6 where to put 'em and I had to pay for and I was
7 hoping cooler heads would prevail and they would
8 say let's move forward and finish the repair.
9 Because we were ready to be done.  This would
10 have been done.
11     Q.   And that hasn't happened obviously?
12     A.   Correct.  It has not happened.
13     Q.   Does Paramount believe that Thirteen
14 Investment owes it any money?
15     A.   No.
16     Q.   Does Paramount believe that it owes
17 Thirteen Investment any money?
18     A.   I don't believe so.  No.
19     Q.   Has Thirteen Investment threatened to
20 sue Paramount other than whatever threats I
21 think were made in that additional conversation
22 back in March or so of 2019?
23     A.   Not that I recall.
24     Q.   Okay.  All right.

85

1         Following today's deposition, can you
2 produce a copy of what you mentioned, your log
3 showing --
4     A.   What I have.  There is some in this
5 folder that was on this job, a binder.
6     Q.   I understand that and I will be
7 directing any request to Thirteen Investment's
8 attorney for them to hopefully retrieve that?
9     A.   Fine.  I know where it was, too.
10     Q.   Okay.  Where was it?
11     A.   Kitchen pantry.
12     Q.   Kitchen pantry, a manila folder?
13     A.   No.  It's like a rubber -- blue rubber
14 construction that you would keep on the job site
15 that in case stuff gets banged up.
16     MR. FORTIN:  Okay.  And if after today's
17 deposition if there's any -- if anything else
18 comes up, for instance from Plaintiff's
19 depositions or further discovery in this case,
20 if there's anything else that I think that
21 Paramount may have as far as documents go, can I
22 reach out to your attorney about that?
23     THE WITNESS:  Yes.  Absolutely.
24     MR. FORTIN:  All right.  Pending any

86

1 questions that Mr. O'Malley may have, those are
2 all the questions I have for you today.
3         Mr. Bertuca, I very much appreciate you
4 coming in today.  Thank you.
5     THE WITNESS:  Thank you.
6     MR. BERTUCA:  I have a few questions.  Should
7 I wait for --
8     MR. O'MALLEY:  You should wait.
9     MR. BERTUCA:  Okay.
10     MR. O'MALLEY:  My name is John O'Malley.  I
11 represent the Plaintiff.
12         Would you pull out Defendant's
13 Exhibit 8, which is the general and special
14 taxes and demolition expenses form.
15               (Short pause.)
16     THE WITNESS:  I'm sorry.
17               (Short pause.)
18     THE WITNESS:  Okay.  I'm sorry.
19               EXAMINATION
20 BY MR. O'MALLEY:
21     Q.   We discussed it earlier and you said
22 you absolutely participated in drafting this.
23         Can you identify the parts on this
24 document that are in your handwriting?

87

1     A.   I don't know for a fact if where it
2 says taxes or that's who went down to Cook
3 County to do it, to make sure that there's no
4 back taxes owed.
5     Q.   Okay.
6     A.   The 3634 South Euclid, I believe that's
7 my handwriting.  Also, on the demolition expense
8 portion to fill out -- yes.  where it says I do
9 hereby authorize Farmers payable to me by loss
10 of fire.
11     Q.   So that's your handwriting that says
12 Farmers insurance and fire?
13     A.   I believe so.  I believe it is.  Yes.
14     Q.   Okay.  And were you with your father
15 when this document was signed and notarized?
16     A.   To the best of my knowledge, yes.
17     Q.   Where did that take place?
18     MR. BERTUCA:  At the job.
19     THE WITNESS:  Probably at the job.
20     MR. O'MALLEY:  Your counsel was talking --
21     MR. BERTUCA:  Oh, I'm sorry.  I'm sorry.
22 BY MR. O'MALLEY:
23     Q.   Where was this document signed?
24     A.   I do a lot of these.  I'm going to

88

1  guess at the job site.
2      Q.  So was Mike there and did Mike sign
3  this document?
4      A.  As the PA, you could sign on something
5  like this.  When I talked to Mike about it.
6  It's a simple form to get, you know, just a
7  process.  And it's the repair contract
8  that...
9      Q.  So is it your testimony where it says
10 Mike Starzec, that's your -- you had signed
11 that?
12     A.  I'm going to say yes.
13     Q.  And does your father's handwriting
14 appear on this?
15     A.  Well, that's just a copy -- that's just
16 a stamped signature.
17     Q.  Who wrote in the handwritten Anthony T.
18 Bertuca?
19     A.  I don't -- maybe -- I don't know.  I
20 don't remember.
21     Q.  Was your father there and did he
22 notarize that signature?
23     A.  I don't remember.  I don't remember.
24     Q.  Do you know who stamped that signature?

89

1      A.  I don't recall.
2      Q.  And then we talked earlier about the
3  contents claim.
4          Is it your testimony -- I'm sorry.
5  It's Defendant's Exhibit 13.
6      A.  Okay.  Okay.
7      Q.  All right.  We've -- you testified that
8  that was your signature, you said your V.A.?
9      A.  It appears to be.  It's not a full
10 signature.  I see a V there, and it appears to
11 be.  Yes.
12     Q.  And earlier we talked about that
13 appears to be Mark's name.
14         Do you know who signed that?
15     A.  I'm sorry.  Mark?
16     Q.  Yes.  Did I misspeak?
17         I'm sorry.  Mike.  I'm sorry.
18     A.  I'm sorry.  I got confused.
19     Q.  Did Mike sign that?
20     A.  I couldn't say if he did or didn't.  I
21 don't remember.
22     Q.  Did you ever give him a copy of this
23 check for him to sign?
24     A.  A copy of it?

90

1      Q.  The original.
2      A.  I'll be honest, I don't remember.
3      Q.  Well, if you take a look, it says to
4  the order of Thirteen Investment and Paramount
5  Restoration Group.  The address is 7301 West
6  25th Street, Suite 111, Riverside, Illinois.
7          So is it your recollection that this
8  check was mailed to that address?
9      A.  I believe so.  Yes.
10     Q.  And do you recall the first time that
11 you saw this document?
12     A.  I don't.
13     Q.  Do you know how -- strike that.
14         Do you know if this -- the original of
15 this check was presented to Mike for his
16 signature?
17     A.  As I said earlier, I don't remember.
18     Q.  And do you recall how much of any of
19 this check was turned into cash?
20     A.  I don't.
21     Q.  Do you know how much was in a blank
22 cashier's check?
23     A.  I do not.  I'm sorry.
24     Q.  And to clarify, do you think that that

91

1  is the type of information that would be on your
2  log?
3      A.  It should be.  Yes.
4      Q.  And you haven't seen this information
5  on the bottom, I assume, which is location type,
6  account number, et cetera.
7          Do you see that?
8      A.  Yes.
9      Q.  Do you recognize any of that
10 information like the account number?
11     A.  No.
12     Q.  And do you still maintain an account at
13 Elmwood Park Currency Exchange?
14     A.  Yes, I do.
15     Q.  And it says for deposit only.
16         Do you see that?
17     A.  I'm sorry.  I don't.  Not on...
18     Q.  It's under your signature -- under the
19 V.A., it says...
20     A.  Okay.
21     Q.  For deposit only.
22     A.  Okay.
23     Q.  Do you know where this check was
24 deposited or was it just turned into cash?

92

93

1    A.   I don't know if it was all -- if we did
2  money orders with it, if it was cash involved
3  with it.  It's very rare to do cash.  So it
4  would most likely be money orders.  As far as
5  where the currency as a -- I don't know where
6  they bank.  No.
7    Q.   And if you were going to process a
8  check at this facility, how much would you be
9  charged in fees and expenses?
10   A.   It depends on the amount of the check.
11 And then you do get charged per money order
12 based on the size of the money order.
13   Q.   So this one was 5,288.50 and Paramount
14 cashed it at Elmwood Park.
15        What were the costs and fees in doing
16 that?
17   A.   I wouldn't know off the top of my head.
18 I'm sorry.  I don't know what money orders got
19 printed.
20   Q.   Is there a way you could figure that
21 out?
22   A.   I could try to.  Yes.  I would need
23 some of my log that was in my folder at the job.
24   Q.   Does Paramount have an accountant?

94

1    A.   A full-time like -- for the company?
2    Q.   Correct.  Correct.
3    A.   No.  No.
4    Q.   Who does Paramount's accounting work?
5    A.   I try to do as much of it as I can.
6    Q.   And who prepares your tax returns?
7    A.   I do the preparation and turn it in to
8  the accountant.
9    Q.   And who would the accountant be in that
10 case?
11   A.   We've used two different accounting
12 places.  One time it was Stanovich.  I believe
13 he did one here for us, and then another year we
14 did it on the online one year.
15   MR. FORTIN:  On the internet?
16   THE WITNESS:  Yes.  The first couple of years
17 we did it that way because we were so small.
18 BY MR. O'MALLEY:
19   Q.   And for the 2018 tax year, who did your
20 taxes, who did Paramount's taxes?
21   A.   2018 has not been turned in yet.  We
22 did an extension.
23   Q.   And who do you have working on those
24 taxes?

95

1    A.   Well, I'm trying to do the online
2  portion as best as I can, and I may have to hire
3  an outside firm.
4    Q.   Who filed the extension?
5    A.   I did it online.
6    Q.   And if you pull up Document 12, that's
7  the check for the $150,000.
8        And you testified that where it says
9  Mike Starzec, president, that was not signed by
10 Mike, was it?
11   A.   No.  It was not.
12   Q.   And who was it signed by?
13        (Short pause.)
14   THE WITNESS:  I'm sorry.  Okay.  I have it.
15 Sorry about that.
16   MR. O'MALLEY:  No problem.
17   THE WITNESS:  I couldn't tell you who did
18 that on Mike's behalf.
19   MR. O'MALLEY:  Well, we know it wasn't Mike.
20 BY MR. O'MALLEY:
21   Q.   And the next line it seems like it's
22 beginning to write Paramount.
23        Do you see that?
24   A.   I see a P.  Yes.

96

1    Q.   Because if you look at it, the payees
2  are Thirteen Investment and BSI Financial
3  Services, ISADA and, et cetera, and Paramount
4  Restoration Group?
5    A.   Okay.
6    Q.   Is it your testimony that your
7  signature does not appear on this document?
8    A.   I don't believe it is.  No.
9    Q.   Did you authorize somebody to sign your
10 signature?
11   A.   They may have.  Yes.  And I would have
12 been okay with that.  I don't remember having a
13 specific conversation.
14   Q.   Well, earlier you testified that you
15 were the president and your sister was the other
16 officer.
17        Is there any other officer or employee
18 of Paramount that would have signed this check?
19   A.   Employee, yes.  As I said earlier.
20   Q.   Who is that?
21   A.   I'm looking at this one and it just --
22 as I'm going back trying to recall everything, I
23 think this was a gentleman Shawn Jacob.
24   Q.   But earlier you testified that you

1  didn't have any employees that you issued W-2s
2  to?
3      A.  No, because all that he would do would
4  help process money and marketing.
5      Q.  And how would you compensate him?
6      A.  Based on the job.  We would figure it
7  out -- he understood the timeliness that
8  sometimes there may be times where -- it wasn't
9  an every week pay, because sometimes I just
10  didn't have the money to pay him.
11      Q.  And how would you pay him?  Would you
12  pay him cash?
13      A.  Cash.  Yes.  Cash or money order.  It
14  would depend.  Sometimes I remember a couple of
15  times doing payments on cards for him.
16      Q.  And where was Shawn's residence?
17      A.  Oak Lawn area -- no.  He was like --
18  like North and LaSalle area.  Old Townish.  I
19  believe Old Townish.
20      Q.  And how did you know Shawn?
21      A.  We went to college together.
22      Q.  Did you go to his funeral?
23      A.  Yes, I did.
24      Q.  And where was that?

97

1  started yet because based on this letter, we
2  didn't start -- at a minimum it was going to be
3  July 30.
4      Q.  After processing this check, how much
5  money, whether it be in cash or checks, did
6  Shawn give you?
7      A.  To be honest, I would have to see the
8  whole breakdown.  I don't have access to it.
9      Q.  And you testified that there appears to
10  be a stamp in the middle?
11      A.  Yes.
12      Q.  It says BCI Financial Services?
13      A.  Yeah.  It's very hard to read.  I just
14  see the B.  It just looks like there's a stamp
15  in the middle.
16      Q.  And do you know where BSI is located?
17      A.  I do not.
18      Q.  Do you have an understanding of how the
19  original check was sent to BCI for their
20  endorsement?
21      A.  I don't know how he did that, no.  If
22  he sent it FedEx, UPS, I don't remember.  It
23  would be a secure form of mail.  It wouldn't
24  just be standard.

99

1      A.  Old St. Pat's.
2      Q.  Is Shawn married or was he married?
3      A.  No, he was not.
4      Q.  Did he have any relatives?
5      A.  Parents.
6      Q.  And do you know what checks Shawn got
7  as a result of processing this $150,000 check?
8      A.  off the top of my head, I do not know.
9      Q.  Do you know how much cash he would have
10  gotten?
11      A.  I don't recall.  I don't remember.  I
12  would have to really look through stuff.
13      Q.  So when this check was cashed,
14  approximately how much work had been done at the
15  house?
16      A.  Well, is the date on here when it was
17  cashed?
18      Q.  There's a couple of dates.
19  6/22/2018 --
20      A.  I know there's a date of issue.  I was
21  looking to see the date when the check was
22  cashed.
23      Q.  It says July 9, 2018?
24      A.  So if it was July 9, then no work had

98

1      Q.  And was there a cover letter that went
2  along with that?
3      A.  I would assume so.  Yes.
4      Q.  Did you look for that cover letter?
5      A.  Yes, I did.  And I couldn't find it.
6      Q.  And do you recognize the signature
7  above that stamp.  I don't know if it's one or
8  two?
9      A.  No, I don't.
10      Q.  Did you go to court on those blight
11  tickets?
12      A.  I believe I did.  Yes.
13      Q.  And what was -- what happened?
14      A.  I explained what happened at the job
15  site, that there was a fire and I had one of
16  my -- I had someone mow the lawn for them and
17  cleanup.  A lot of it was a mess left from the
18  tenants.  How the house was set up, it was
19  almost like they shared a driveway, but it
20  wasn't their driveway and it's a wide open space
21  and the neighbors next door just got extremely
22  frustrated.
23      I don't know also if this was something
24  previous to the fire, but once I explained it

100

Vincent Bertuca 01/03/2020

1  and assured that it was going to be maintained,
2  everything was understood.
3      Q.  And who is Mike Raef?  R-A-I-F [sic].
4      A.  He's a building estimator.
5      Q.  And who does he work for?
6      A.  He's full time with a large public
7  adjusting firm, Michaelson & Messinger.  And I
8  hired him independently to write estimates for
9  me.
10     Q.  In other words, you don't hire
11 Michaelson & Messinger, you hire Mike directly?
12     A.  No.  I hire him through Michaelson &
13 Messinger.
14     Q.  And how do you compensate him for that
15 work?
16     A.  He gets 3 percent of what the
17 settlement amount is.
18     Q.  And was he paid 3 percent of the amount
19 here?
20     A.  Michaelson & Messinger was paid 3
21 percent, yes.
22     Q.  And was that one of the checks?
23     A.  Yes.
24     Q.  And does that come out of -- what?

101

1      A.  I'm sorry?
2      Q.  How do you account for that 3 percent
3  payment?
4      A.  In my accounting?
5      Q.  Yes.
6      A.  I factor that into as a cost of the
7  job.  That's a job cost.  I need somebody --
8  he's very good.  He's very experienced.  It's
9  worth the 3 percent.
10     Q.  And that comes out of your end or does
11 that come out of Thirteen Investment?
12     A.  Well, the end is insurance proceeds.
13 And that's what we're doing the repair for.  So
14 that's what I'm basing that off of.
15         To give you an example, maybe this will
16 clarify it.  If this was a homeowners policy, I
17 hire an independent person to actually
18 physically write all the personal property as
19 well.  I don't charge the homeowner, per se.
20 But it is coming out of the insurance proceeds.
21     Q.  So talking about the contents here, did
22 Mike do any work on the contents?
23     A.  I don't recall.  Generally he wouldn't
24 because Mike's building only.  And on a renters,

102

1  I wouldn't -- it would more be coming up with a
2  fair market value.  Because it was such a small
3  amount.  We would use someone independently on
4  an entire house that, you know, there's 3
5  floors.  For example, if the tenants had renters
6  coverage, a lot of their stuff would have been
7  accounted for and paid for.
8      Q.  So the amount of the contents and the
9  check was 5,288.50.
10         Was any of those proceeds used to
11 purchase any of the items listed in the
12 contents?
13     A.  No.  That order had not been done yet.
14     Q.  So there weren't any checks, for
15 example, made payable to Lowe's or Home Depot or
16 Abt or --
17     A.  It all went for the job as a whole and
18 what we normally do is when it's time for
19 contents purchasing, make a suggestion to go to
20 a couple of stores where maybe we could get a
21 good deal because we send a lot of business to
22 them and make the purchase and get it delivered.
23     Q.  And did that occur here?
24     A.  No.  Because we weren't set to order.

103

1  I needed to get the kitchen cabinets and granite
2  installed first.  I like to have it installed
3  and remeasure.
4         It was ready to happen.
5      Q.  Earlier you testified that Mike got a
6  copy of the letter.
7         What's the basis for that testimony?
8      A.  I'm sorry.  What letter?
9      Q.  The letters with the checks.
10     A.  Oh.  Exhibit 10?
11     Q.  Is it 10 or -- what's Exhibit 10?
12     A.  That's the --
13     Q.  Oh.  There's one.
14     A.  That would be the letter.
15     Q.  And it says Thirteen Investment,
16 Michael S-E-M-Y-C-K.
17         Do you see that?
18     A.  On Page 2, correct?
19     Q.  Correct.
20     A.  Yes.
21     Q.  And it says it's cc'd, but how do you
22 know that Mike got a copy of it?
23     A.  He told me that he did.
24     Q.  And do you know where that was

104

1  addressed?
2      A.  I don't.
3      Q.  Have you spoken to anyone from Farmers
4  since you received the checks and cashed them?
5      A.  Scott Woods did call me.  I believe
6  once or twice I've spoken to Scott.
7      Q.  And what did you discuss?
8      A.  Scott was who informed me that Mike
9  called him and asked why the insurance wasn't
10  issuing draws on a check.
11      Q.  And what else did you discuss?
12      A.  That was about it.  It was a pretty
13  brief conversation.
14      Q.  Is that the only discussion you've had
15  with anyone from Farmers since the checks were
16  sent in June?
17      A.  To the best of my knowledge.  If there
18  were other discussions, it may have been about
19  the repair, but I don't recall off the top of my
20  head.
21      Q.  Did you have any discussions with
22  anyone at BSI at all?
23      A.  No.  I did not.
24      Q.  Do you know if anyone at Paramount did?

105

1      A.  I would imagine.  Yes.
2      Q.  And who would that be?
3      A.  Based on what I'm seeing on the check,
4  I'm guessing that would have been Shawn.
5      Q.  And you said you had spent
6  approximately 100,000 on the project, which
7  would leave a balance of about $60,000.  And
8  where are those proceeds?
9      A.  The number is definitely over a
10  hundred.  I don't know the exact number.  It's
11  definitely over.  We were prepared to take a
12  pretty substantial loss on this claim.
13      Q.  And do you have any records showing the
14  expenses that you incurred in connection with
15  this?
16      A.  As far as all the material that was
17  purchased?
18      Q.  Yes.
19      A.  Yes.  I could -- I could get that.  A
20  lot of that was in that folder.
21      Q.  Did you look for those documents before
22  you came here today?
23      A.  Oh, I certainly did.
24      Q.  And did you find it?

106

1      A.  No.  Because it's in the folder that
2  was on the job site.
3      Q.  Did you ever tell Scott Woods or anyone
4  at Farmers that you had been authorized to sign
5  Mike's name on the check?
6      A.  I don't recall.  I don't remember.
7      MR. O'MALLEY:  That's all the questions I
8  have now.
9      MR. BERTUCA:  Okay.  I have a couple of
10  questions.
11              EXAMINATION
12  BY MR. BERTUCA:
13      Q.  You testified that there were extras
14  that you provided on this job?
15      A.  Yes.
16      Q.  Would you list and tell us about those
17  extras?
18      A.  Again, it was pretty much a demand to
19  install central air in the house.  Initially,
20  they wanted to do a boiler, keep and -- replace
21  the boiler and do central air.  And the costs
22  would have been crazy.  So that's why we did
23  both central air and central -- so central air
24  and forced air.  But having to do that meant

107

1  installing two new units because of the size of
2  the house.  It just did not make sense to only
3  install one.  We had to remove every existing
4  radiator and the plumbing incorporated with it.
5  And doing so with that also meant replacing all
6  the hardwood in the sections where the radiators
7  had been sitting for years and where there were
8  holes where the pipes were ran, installing all
9  the new ductwork for the furnaces also meant
10  building soffits for all of this ductwork in a
11  rather large home.  We did metal soffit, which
12  is a little more expensive but it allows the
13  drywall to be more butted up to the ductwork.
14  And then that also then included having to put
15  drywall up in all these new areas where none of
16  that was a part of the damage, and tape it,
17  paint it.  You do the whole process as a
18  finished product.
19          Also, the plumbing was in a real bad
20  condition in areas not affected by the fire.
21  And what appeared once we really got a look at
22  things, were when you try tying in old and new
23  plumbing, so you're doing copper with black
24  pipe, it's an absolute disaster.  Because you're

108

1  going to get -- it's going to cause -- it's a
2  good short-term solution, but long-term -- so we
3  went ahead and did this additional plumbing work
4  as well as a lot of additional electrical work
5  that -- and it was a good amount on the
6  settlement for the electric, but there's -- I
7  don't -- we had to redo the service. So that's
8  going from outside at the pole. It's a pretty
9  expensive process and putting in the new meter.
10 And you couldn't -- I couldn't go back to the
11 insurance company and ask, because it's not
12 something that's covered. If they had municipal
13 code, it would be covered.
14       I don't know how some of this stuff was
15 prior but we had to re -- definitely pull wire
16 on the whole house. So that's expensive. And
17 you go the route where it takes longer where
18 you're actually feeding through. You pull out
19 the old and you're feeding it through.
20 Sometimes it's quicker to install all new pipe.
21 But then we're removing walls and ceilings and
22 we're opening up Pandora's Box.
23       Q.   Were these items itemized on the
24 insurance breakdown?

                                            109

1       A.   No.
2       Q.   And that's what you mean by extra?
3       A.   Correct.
4       Q.   That Paramount paid for that?
5       A.   And also the large amount of additional
6  debris removal as part of the demolition. And
7  that's not something that the insurance company
8  should be responsible for, that you had tenants
9  that -- it's unfortunate, I mean but they left
10 such a large volume of stuff as well as I think
11 they were having their friends bring garbage in
12 there.
13      Q.   And you testified that the day that you
14 were fired, that you had granite and cabinets
15 that were waiting outside of the home to be
16 delivered?
17      A.   Full cabinetry and granite. And with
18 granite, it's cut.
19      Q.   Did you have to pay for that? Did
20 Paramount have to pay for that?
21      A.   Yes, we did.
22      Q.   Now, there was testimony earlier that
23 Mike, and I don't know how to pronounce his last
24 name, so you know who I'm referring to.

                                            110

1       MR. O'MALLEY: Mr. Starzec.
2  BY MR. BERTUCA:
3       Q.   You knew about these two checks that
4  were issued?
5       A.   For sure he would have because that
6  gets sent to him from the insurance company.
7       Q.   Okay.
8       A.   But he told me he did.
9       MR. BERTUCA: I have no other questions.
10      MR. FORTIN: I just have two -- or maybe one
11 more.
12           EXAMINATION (Further)
13 BY MR. FORTIN:
14      Q.   Mr. Bertuca, as a public adjuster when
15 you are retained by an insured to assist them
16 with an insurance claim, is it common for the
17 insurance carrier to mail the physical checks to
18 you?
19      A.   Yes.
20      Q.   Okay. Is it uncommon or -- let me put
21 it this way: Have you ever had an occasion
22 where you were retained as a public adjuster and
23 the physical checks from the insurance company
24 were mailed to the policyholder instead of you?

                                            111

1       A.   And the reason for my delay in
2  answering is because there are times when I
3  don't act as a public adjuster, just as a
4  general contractor. So the contract is
5  different.
6       Q.   Right.
7            So I'm just asking when you're retained
8  as a public adjuster?
9       A.   They should be coming to the office.
10 Yes. And some adjusters don't. And it's not --
11 technically it should be coming to the office.
12 Yes.
13      Q.   Meaning your office, the public
14 adjuster's office?
15      A.   Yes. But I will say that if a policy
16 holder did get a check, we would know because we
17 would get a copy of this letter.
18      MR. FORTIN: Okay. Thank you.
19           You have the opportunity to read --
20      MR. O'MALLEY: I have a couple of quick
21 followups to your questions.
22           EXAMINATION (Further)
23 BY MR. O'MALLEY:
24      Q.   Do you have any photographs of the

                                            112

```
 1  debris removal, the extra debris --
 2      A.   Yes.  Yes.
 3      Q.   And where are those?
 4      A.   They're printed.  There's definitely
 5  some on the job site.  I'll have to look for
 6  some more additional ones.
 7      Q.   Did you look for those when you
 8  responded to the subpoena?
 9      A.   I was really trying to find as many
10  pictures as I could.  It was very difficult.
11  You know, because what is saved on your phone is
12  not -- I have a new phone.  I'll try and -- I'd
13  have to look for an old phone.
14      Q.   You were testifying about the granite
15  and all the deliveries that were being made.
16           Do you have any documents?
17      A.   Sure.
18      Q.   And where are those?
19      A.   I could have those.
20      Q.   Did you look for those documents?
21      A.   They're at the job site.
22      Q.   The job site...
23      A.   That we got locked out of.
24      Q.   So the payment for the granite you just
                                              113
```

```
 1  testified, that would also be on the job site?
 2      A.   No.  Not the payment.  It would be -- I
 3  paid them with a check -- a money order.
 4      Q.   Do you have that?
 5      A.   I'd have to look for it.
 6      Q.   Okay.
 7      A.   The log for that job where I would
 8  write the date, the money order number down, who
 9  it went to, was unfortunately it's in that job.
10  So if I had that, that would really make my life
11  a lot simpler as far as producing.
12      Q.   Had you paid for those, the granite,
13  et cetera, before the delivery?
14      A.   I always do.  Especially on that
15  particular one.  It was a lot of granite because
16  it was a rather large counter and a pretty big
17  island.  The island -- it was two full slabs of
18  granite.
19      Q.   And the check would have been from a
20  currency exchange?
21      A.   It could have been a money order.
22  Correct.
23      Q.   A money order issued by a currency
24  exchange?
                                              114
```

```
 1      A.   And I take that back.
 2           Some of the payment that I do do with
 3  this granite company is cash, because he gets a
 4  better deal on the granite.  And we weren't paid
 5  for granite replacement.  We were only paid to
 6  detach and reset and clean the granite.  So I
 7  was trying my best to get the best price I could
 8  on a good product.  The granite that was in that
 9  job would not detach and reset because it was a
10  low grade granite.  Once you detach and reset
11  that glued down on the cabinetry and once that's
12  taken off, it's a thin granite.  It's almost
13  like a post formed.  It's going to crack.  And
14  granite can withstand smoke in a fire if it's
15  cleaned properly.  But to try to detach and
16  reset that, we knew we would be cracking.  The
17  granite, they tried removal.  There was just no
18  way to remove it properly.  And that's based on
19  the grade of granite that was on there.
20      Q.   Earlier I think we've agreed that you
21  have a log and that you're going to produce it
22  to us; is that --
23      A.   A lot of that is at the job site in a
24  big blue folder.
                                              115
```

```
 1      Q.   Would those documents be any other
 2  place?
 3      A.   No.  Because it was a book that I had
 4  in that folder.  And the only reason I had all
 5  that in there is because we were being so
 6  specific about the measurements of everything.
 7      Q.   So you've looked -- the places the
 8  documents would be -- I mean there's none in
 9  your car?
10      A.   No.
11      Q.   So they'd be on the job site where they
12  were left?
13      A.   Correct.  And I normally wouldn't leave
14  something like that on the job.  And it was left
15  unintentionally.
16           MR. O'MALLEY:  All right.  I would like those
17  documents, and I think counsel would like them,
18  too.
19           MR. FORTIN:  I would and I think,
20  Mr. O'Malley, it might make everyone's life
21  easier if your client were to look to see if
22  this folder is still at the job site.
23           MR. O'MALLEY:  Sure.
24           MR. FORTIN:  That would be great.
                                              116
```

```
 1         Do you have any other questions?
 2    MR. O'MALLEY:  No.  I'm done.
 3    MR. BERTUCA:  I have a follow-up question.
 4    MR. FORTIN:  Sure.
 5         EXAMINATION (Further)
 6    BY MR. BERTUCA:
 7    Q.   What about the copy, the final repair
 8    contract with Thirteen Investment?
 9    A.   That's in the folder because that's a
10    repair spec.
11    Q.   Okay.
12    A.   I would never leave a full detail like
13    this for a crew to try to understand, so I
14    simplify it.  That's on the job site.  With a
15    final repair contract.
16    MR. O'MALLEY:  All right.
17    MR. FORTIN:  Okay.  Mr. Bertuca, you have the
18    opportunity to read and sign a copy of your
19    transcript and make any changes to words that
20    were incorrectly transcribed for whatever reason
21    or you can choose to waive that right and trust
22    that the court reporter has accurately put down
23    your words.
24    THE WITNESS:  I trust her.
```
117

```
 1    MR. FORTIN:  So you'll waive?
 2    THE WITNESS:  Yes.
 3    MR. FORTIN:  Okay.  That will do it.
 4         FURTHER DEPONENT SAITH NOT.
 5         (Deposition concluded at 1:53 p.m.)
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```
118

```
 1    STATE OF ILLINOIS      )
 2                          )  SS:
 3    COUNTY OF C O O K      )
 4         I, Johnetta Stafford Taylor, a Certified
 5    Shorthand Reporter within and for the County of
 6    Cook County and State of Illinois, do hereby
 7    certify that heretofore, to-wit, on
 8    January 3, 2020, personally appeared before me,
 9    at 222 North LaSalle Street, Suite 1400,
10    Chicago, Illinois, VINCENT BERTUCA, in a cause
11    now pending and undetermined in the U.S.
12    District Court, Northern District of Illinois,
13    Eastern Division wherein THIRTEEN INVESTMENT
14    COMPANY, INC. is the Plaintiff, and FOREMOST
15    INSURANCE COMPANY GRAND RAPIDS MICHIGAN is the
16    Defendant.
17         I further certify that the said VINCENT
18    BERTUCA was first duly sworn to testify the
19    truth, the whole truth and nothing but the truth
20    in the cause aforesaid; that the testimony then
21    given by said witness was reported
22    stenographically by me in the presence of the
23    said witness, and afterwards reduced to
24    typewriting by Computer-Aided Transcription, and
```
119

```
 1    the foregoing is a true and correct transcript
 2    of the testimony so given by said witness as
 3    aforesaid.
 4         I further certify that the signature to
 5    the foregoing deposition was waived by counsel
 6    for the respective parties.
 7         I further certify that the taking of this
 8    deposition was pursuant to notice and that there
 9    were present at the deposition the attorneys
10    hereinbefore mentioned.
11         I further certify that I am not counsel
12    for nor in any way related to the parties to
13    this suit, nor am I in any way interested in the
14    outcome thereof.
15         IN TESTIMONY WHEREOF:  I have hereunto
16    set my hand and affixed my notarial seal this
17    13th day of January 2020.
18
19
20
21
22
23    COOK COUNTY, ILLINOIS
24    LIC. NO. 084-001583
```
120













McCorkle Litigation Services, Inc.
Chicago, Illinois (312) 263-0052



